[No. 19605. Department One.   October 29, 1925.]

CORA DAISY STOREY, as *Executrix, Respondent,* v.
CECIL C. GAISFORD *et al., Appellants.*[1]

CANCELLATION OF INSTRUMENTS (5, 6)—RIGHT OF ACTION—UNDUE INFLUENCE—FRAUD. Findings of fraud and undue influence are sustained, warranting the cancellation of an option agreement made by a feeble man 79 years of age to a son, in consideration of care and life support, where, within two weeks, the parent became dissatisfied and wanted it set aside, and within a month became insane through worrying about the matter.

EXECUTORS AND ADMINISTRATORS (141)—ACTIONS—RIGHT TO SUE. An executrix may sue to cancel an option contract, obtained from her intestate through fraud and undue influence in fraud of the rights of heirs.

Appeal from a judgment of the superior court for Pierce county, Clifford, J., entered March 7, 1925, upon findings in favor of the plaintiff, in an action to cancel a contract, tried to the court. Affirmed.

*J. H. Gordon* and *A. O. Burmeister,* for appellants.
*Henry Arnold Peterson* and *Fred G. Remann,* for respondent.

[1]Reported in 240 Pac. 9.

HOLCOMB, J.—These adversaries, close relatives, are engaged in a rather bitter contest over property of moderate value. They are the children of Benjamin Gaisford, deceased, and respondent is the executrix of his last will and testament.

The action was begun by the executrix to cancel and set aside a deed of a portion of the real estate and an option contract for the remainder, in Pierce county, owned by decedent and his wife, who had died about a year before his decease, in community. Prior to her death, Mr. Gaisford had made an agreement with her that he would make a will devising and bequeathing the property in a certain manner.

In the spring of 1923, when Mrs. Gaisford became ill, Mr. Gaisford sent for his son Cecil, one of the appellants here, who then resided in Denver, Colorado, to come to his home to be with his mother. In April, 1923, with some financial assistance from his father, he came and took up his residence in the home of his parents, and assisted in taking care of his mother until she died on May 28, 1923. Thereafter, he and his family maintained their home with the father until June 21, 1924. Apparently their relationship was agreeable, the father expressing himself repeatedly as being well pleased with the care which he was getting, and the home relationship with Cecil and his wife.

The property in controversy was the home of the parents, and consisted of a tract of land in Puyallup on which there was an old house in which they lived. A portion of it was devoted to berry raising. On May 22, 1924, the father executed a deed to Cecil to about one-half of the real estate in question, reserving a life interest in himself, and providing that he would construct upon the premises a residence for the occupation of himself and Cecil and family. It was covenanted that Cecil would support and maintain

him during his life, would furnish him with home accommodations, nursing, and care, and would pay all incumbrances against the property, and all subsequent assessments and taxes. It was agreed that the father should have a separate room in the residence, have suitable heat, furniture, and accommodations, and that the father would have the right to any rent or revenue derived from fruit or other products grown on the place during his lifetime.

On the same day the father executed an option agreement in favor of Cecil. This agreement gave to Cecil an option to purchase the remaining portion of the premises at the price of four thousand dollars within the period of three years. It was further agreed that the premises should be subdivided in convenient residence lots, which should be sold and paid for on a certain basis per front foot. They stipulated that Cecil contemplated the construction of residence buildings on the several tracts, with the exception of the tract occupied by the old residence, and the placing of mortgages upon the respective tracts as buildings were erected thereon, the father agreeing to execute notes and mortgages necessary to finance the building operations, and to pay the incumbrances against the premises (except the paving assessments) and furnish abstracts of title.

Title to all the premises was to pass to Cecil when the father had received the sum of four thousand dollars, less costs and expenses for abstracts. The price of one thousand dollars was placed upon the old residence property. The agreement stated that its purpose was to net the father four thousand dollars, and to allow Cecil any profit above, that amount as compensation, and to furnish him and his family support while prosecuting the enterprise. Cecil immediately entered upon the enterprise, ordered some ab-

stracts, and made some arrangements for securing mortgage loans. After a few weeks, negotiations were halted, and none were ever completed.

Subsequently, on June 13, 1924, Benjamin Gaisford executed his will. By its terms, he gave a nominal sum to a daughter, Sarah Bigham, certain items of furniture to his sons George, Cecil and Ben, and his daughter, this respondent; and recited that, whereas, he had already advanced to Cecil a portion of his real property and provided by agreement with reference to the balance of his real property, he did not desire to make any further provision for Cecil; and left all the residue of his estate, share and share alike, to his son Ben, and his daughter Cora. He nominated Cora executrix of the will. This will was duly probated and respondent accepted and assumed the duties of executrix.

Having learned something of the deed and option, and the agreement between Cecil and his father, a controversy immediately arose among the children and with the father, the details of which are not necessary to relate.

Benjamin Gaisford was seventy-nine years of age at the time of the transaction in question. He apparently had been failing somewhat rapidly after the death of his wife. After objections had been made to him as to the disposition of his property to Cecil, his mind soon became seriously affected. He was strongly impressed with the idea that he had not carried out the agreement he had made with his wife, and that he had committed an unpardonable sin. It appears to have so prayed upon his mind that in a short time he became mildly insane. On June 21, 1924, one of the judges of the superior court and a physician having examined him at his home, he was found incompetent, and a guardian appointed for him. He was also, on

the same day, declared insane. The physician believed his mental condition caused by his property arrangement with Cecil. The guardian, a disinterested person, was directed to proceed to have Cecil removed from the house for the benefit of the old gentleman's condition, and Cecil was accordingly directed by an order of the superior court in the guardianship proceeding to remove from the house. Mr. Gaisford died from self-administered poison on August 11, 1924.

Upon the trial of the case the trial court made findings which were excepted to by appellants, as follows:

"That, for several years prior to May 22, 1924, said decedent, together with his wife, had resided on said premises as their home; that during the month of May, 1923, his wife died, leaving surviving said decedent, together with five adult children, two being the adverse parties to this suit; that for some years prior to the death of said mother, defendant had, with his family resided in the state of Colorado, but that shortly prior to the death of said mother, defendant, with his family moved to the home of decedent and said mother at Puyallup, Washington; that after the death of said mother, defendant, with his family continued his residence alone with decedent until approximately the 21st day of June, 1924, when a third party was appointed guardian of such decedent because of his mental breakdown.

"That the relation existing between said decedent and said defendant on May 22, 1924 and for some time prior thereto was fiduciary in its character and one of trust and confidence; that said decedent was seventy-nine years of age, easily susceptible to influence from defendant and his mind then in such condition as to be unable to appreciate the full significance of the transactions thus had with defendant; that said instrument, being plaintiff's Exhibit 'A,' 'B,' and 'C,' and each thereof was unfair and unreasonable and against the best interests of such decedent and that said decedent did not understand their purport or the

extent thereof; that the execution of such instruments by decedent was the cause of his subsequent breakdown and ensuing death; that said instruments and each thereof, were fraudulently and wrongfully and as the result of undue influence obtained by defendant from plaintiff and in violation of the fiduciary relation existing between said parties; that they and each of them were without consideration except that providing for the future support of decedent; that the defendant did not enter into such agreement for the future support in good faith and did not have the best interests of decedent at heart in so doing and because of having thus obtained said instruments as above set forth, had placed himself in such a position and relation with reference to decedent as to render unwise and impracticable, if not impossible, the operation of such support provision.

"That the treatment by defendant of decedent at all times subsequently to the commencement of decedent's illness in June, 1924 and continuing to his death on August 11, 1924, was wholly inconsistent with fair, open and equitable dealings between defendant and said decedent; that the position thus taken by defendant and his continued attitude thus displayed towards his father, was unconscionable and plain to the effect that defendant had no concern for the welfare of his father, said decedent, and was such as not to warrant the furnishing by defendant of the required and contemplated support of decedent.

"That nothing has been done by defendants pursuant to such instruments, nor have they or either of them, parted with anything of substantial value because thereof and equity and good conscience requires that said instruments, being plaintiff's exhibits 'A,' 'B,' and 'C,' above referred to and each of them, should be rescinded, cancelled, set aside and rendered of no legal effect.

"That on the 13th day of June, 1924, said decedent executed his last will and testament, which was admitted to probate in cause No. 17984 of the superior court of the state of Washington, in and for the county of Pierce, said will being in terms and figures as set

forth in Exhibit 'D,' attached hereto and made a part hereof; that the above described property is not, nor is any part thereof, devised or bequeathed to defendants or either of them under or by virtue of said will and that defendants do not, nor does either of them take or receive any portion of said property by virtue thereof.

"That plaintiff, as such executrix, is the owner in fee simple of said property free and clear of any and all rights, titles, estates, liens or interests of defendants or either of them in, to or upon any of said property or any part thereof; that defendants do not, nor does either of them, have any right, title, estate, lien or interest in, to or upon said premises and that said defendants should be excluded from any right, title, estate, lien or interest in, to or upon said premises and restrained from asserting any right, title, estate, lien or interest therein or thereto."

Other salient facts which may be alluded to which we think have considerable bearing upon the matter are that the first solicitation of the scrivener who drew up the deed and agreement between the deceased and Cecil was made by Cecil. He was informed by the attorneys that they did not care to prepare any such agreements until his father had consulted them, and authorized the agreements. The father then came in with Cecil and interviewed Mr. Porter, one of the attorneys, and a man of integrity and trustworthiness, and was advised by Mr. Porter not to make the deed or agreement. Mr. Porter told him that he had known of a number of such agreements between parents and children all of which had been unfortunate and turned out badly. Mr. Gaisford, however, insisted that he had full trust and confidence in Cecil, and that he desired to make the deed and agreement. Mr. Porter testified, and so did his partner, that, at the time they consulted with Mr. Gaisford about the property arrangement, Mr. Gaisford was as much in his right mind as he ever

was; that his mind was perfectly clear. That probably is true so far as Mr. Porter and his partner could discern; yet, almost exactly thirty days from the date of the making of the property arrangement, the father was declared insane, and in another proceeding he was declared incompetent and a disinterested guardian appointed for his person and estate. Nor does the evidence of the attorneys at all indicate how far mental domination over the father had been acquired by Cecil, who was domiciled constantly with him.

The evidence also shows that, in about two weeks after the property arrangement had been made, the deceased was apparently utterly dissatisfied with it and wanted it set aside; and that, if it had been set aside as he desired by Cecil's surrendering his share in the arrangement, the mental condition of the deceased might have been improved, as the doctor said, and he might have been saved from insanity. This surrender, although promised by Cecil to the doctor, he refused to perform, with the result already stated.

Appellant earnestly contends that the trial court erred in finding fraud in the procurement and execution of the documents in question, asserting that fraud is never presumed and only to be found upon clear, cogent and convincing evidence; citing *Wakefield v. Fish,* 62 Wash. 564, 114 Pac. 180; *Pierce v. Seattle Electric Co.,* 78 Wash. 167, 138 Pac. 666; *Jarvis v. Ireland,* 89 Wash. 286, 154 Pac. 455, and *State v. Kosai,* 133 Wash. 442, 234 Pac. 5.

These cases do not apply to a situation such as exists in this case. As was said by Gordon, J., in *Payette v. Ferrier,* 20 Wash. 479, 55 Pac. 629, quoting from *Bogie v. Bogie,* 41 Wis. 209:

"Conveyances of property by aged and infirm people to their children in consideration of promised support

13—136 WASH.

and maintenance, are somewhat peculiar in their character and incidents, and must sometimes be dealt with by the courts on principles not applicable to ordinary conveyances.''

And by Rudkin, J., in *Gustin v. Crockett,* 51 Wash. 67, 97 Pac. 1091:

''If the deed cannot be set aside for fraud unless the proofs show that the instrument was fraudulent in its inception, we are not prepared to say that the court was in error; but such, in our opinion, is not the law. The respondent Laura S. Crockett was at one time the daughter-in-law of the appellants, and while that relation had ceased through the death of the son, the relation between them was still one of trust and confidence, and the court so found. . . . Where there is a wilful and wrongful violation of such an agreement, a court of equity will grant relief, and as was said by the court in *Oard v. Oard,* 59 Ill., 46, . . . 'If the recission of the contract cannot be referred to any other head of equity jurisdiction, it would be proper to presume that it was made in the first instance with a fraudulent intent.' This is but the common instance of people who are old and infirm conveying their property to their children, or to others in whom they have trust and confidence, where the consideration for the conveyance is, in whole or in part, an agreement for future support and maintenance. In such cases courts of equity have never failed to rescind the contract and cancel the deed for a wilful violation of the agreement to support and maintain, and they never inquire whether the transaction was fraudulent in its inception or not. The wilful and wrongful violation of the agreement is in and of itself ample ground for the rescission.''

See, also, Smith, Law of Fraud, §§ 100, 101, and 102, pp. 124 to 127; *Hensan v. Cooksey,* 237 Ill. 620, 86 N. E. 1107, 127 Am. St. 345; *Dingman v. Romine,* 141 Mo. 466, 42 S. W. 1087.

There being ample, though conflicting, evidence supporting the findings of the trial court in every

feature, and the burden being upon the appellants to sustain the good faith of the transaction in controversy, rather than the contrary, we are of the opinion that the findings of the trial court should not be disturbed.

A further question urged by appellants is that the father alone could take advantage of the failure on appellants' part and bring an action to set aside the transfer, and that the heirs or the executrix have no such right.

We are unable to assent to that proposition. It is stated in 18 C. J. 233, that:

"In such a case, if the evidence is such as to justify a conclusion that the contract was entered into with fraudulent intent, it may be set aside in equity at the suit of the grantor, and it has been held that such right descends to his heirs."

A leading case upon this question is *White v. Bailey,* 65 W. Va. 573, 64 S. W. 1019, 23 L. R. A. (N. S.) 232. There the court said:

"The only other question deemed worthy of consideration is whether any person other than the grantor can prosecute this right of rescission. If the plaintiff were a mere assignee of the cause of action, his right to sue would be gravely doubtful; but he is the representative of the estate to which it belongs, and sues as such. Hence, there is no shadow of maintenance and champerty forbidding entry to courts of equity in so many cases reported in the books. Nor is the cause of action one that dies with the person."

In the editorial case notes in L. R. A. (N. S.) *supra,* the cases are collected upon this question, and the editor of the notes states:

"The cases involving this question are not numerous, but are very harmonious in sustaining the views expressed in *White v. Bailey.*"

Appellant quotes from 18 C. J. 170, a text as follows:

"Where the grantor prevents the grantee from carrying out his agreement, he will not be permitted to avoid the deed."

And,

"Where the grantor fails to object during his lifetime upon the ground that support is not furnished, it has been held that his heirs cannot afterward seek to have the deed cancelled."

Also, cases to the effect that, where the parties are mutually satisfied with the carrying out of the support agreement, a legatee cannot set it aside. *Smith v. Hay,* 152 Pa. St. 377, 25 Atl. 562; *Harwood v. Shoe,* 141 N. C. 161, 53 S. E. 616.

The text of *Corpus Juris* and the cases relied upon do not fit this case for the reason that, in this case, the grantor did object on various grounds to the agreement that he had entered into with appellants, and sought to have it rescinded, and the parties were not mutually satisfied; for the deceased apparently was very much dissatisfied, so much so that apparently he lost his mind worrying over it.

At all events, we think the law is as stated in *White v. Bailey, supra,* and the cases cited in the case note.

Judgment affirmed.

TOLMAN, C. J., ASKREN, FULLERTON, and PARKER, JJ., concur.