[No. 26733. *En Banc.* March 21, 1938.]

MINNIE KALKWARF, as *Administratrix, Appellant,* v. PAUL GESCHKE et al., *Respondents and Cross-appellants.*[1]

*Ott & Cross,* for appellant.

*W. L. LaFollette* and *H. J. Welty,* for respondents and cross-appellants.

ROBINSON, J.—Matilda Geschke died in December, 1935, leaving as her heirs two children by her first marriage and six by her second. Among the latter group were the appellant, Minnie Kalkwarf, and the respondent and cross-appellant Paul Geschke.

[1] Reported in 77 P. (2d) 612.

For some years previous to August 16, 1933, Mrs. Geschke had owned two wheat farms in Adams county and a house and lot in Ritzville. On that date, she deeded all of this real estate to her son Paul, he assuming all encumbrances thereon and a covenant running with the land to properly care for his mother and supply all her needs during the remainder of her life, and to provide suitably for her funeral and burial. Some ill will had arisen among the members of the family due to this transaction, and for other reasons.

On the evening of the day his mother was buried, Paul Geschke called his brothers and sisters together at his house for the purpose of effecting a reconciliation. He then stated that, although he was under no liability to do so, he proposed to sell the property, deduct the expenditures made with respect to the care of their mother, and divide the residue among the eight children. He did not carry out this proposal, and this action followed.

The deed of August 16, 1933, was attacked, on the ground of mental incapacity and undue influence. It was further contended that the respondents held the land as trustees for the heirs, and an accounting was asked.

In support of the trust theory, the appellant, Minnie Kalkwarf, testified that, at the reconciliation meeting on the evening of her mother's burial, Paul Geschke admitted that, upon taking the deed, he had promised his mother that he would make a division of the property after her death. She was supported in this evidence by her two half-brothers. If Paul Geschke did make a promise to his mother to divide the property after her death, it would not support an express trust, since the promise rested in parol, and it is more than doubtful whether it would furnish the basis for imposing a constructive trust under the rules

laid down in our leading case on that subject, *Farrell v. Mentzer,* 102 Wash. 629, 174 Pac. 482.

It is, however, unnecessary to deal with that question as a matter of law. Paul Geschke testified that he made no such admission, and his evidence was corroborated by another brother and a sister, both testifying against interest. Furthermore, on giving his oral decision at the close of the case, the trial judge said:

"I can't accept as the truth the statements of these witnesses as to what Paul said, that he told them he had made a promise to his mother to divide the property."

We pass now to the more serious aspect of the matter. Appellant rightly contends that there was a dual fiduciary relation between her mother and Paul, namely, parent and son, and principal and agent; and further that, this being true, the burden was upon Paul to sustain the good faith of the transaction. This is a correct statement of the law. *Storey v. Gaisford,* 136 Wash. 378, 240 Pac. 9. It remains to apply it to the facts of the case.

Mrs. Geschke's husband died in June, 1912. Paul at once began to assist her in looking after her business affairs, and began farming her lands, or, at least, a part of them, in 1916. After 1926, Mrs. Geschke was never in good health. On January 3, 1930, she suffered a stroke which rendered her almost physically helpless. From the last of January until May, 1930, she lived at the home of her daughter Gretha Mulligan, in Pasco. She then went to appellant's home for six weeks, then returned to the Mulligans and remained there until May 10, 1931. She then returned to appellant's home, where she remained until July, 1933. During the first six weeks she stayed with appellant, appellant received five dollars per day for her care. Later, the sum allowed was reduced to four dollars per day, plus, if we

correctly understand the record, a five dollar per week allowance for the employment of a maid.

From January, 1930, Paul Geschke had exclusive charge of his mother's business affairs, although he does not seem to have had a power of attorney until December 5, 1932. In January, 1930, Mrs. Geschke owned her two farms, her house and lot, and had $3,890 in various banks. By the early summer of 1933, this cash had been nearly, if not altogether, exhausted. There was a considerable amount due appellant, Mrs. Kalkwarf, for her mother's care. She demanded it from Paul. As illustrative of the conditions obtaining at this time, we quote from appellant's evidence:

"Q. There was no trouble at all between you and Paul about anything until there was no more money, isn't that so? A. That is right. . . . Q. You do not say that he did not tell you to wait until after harvest and that he would pay you all he could, or words to that effect? A. No, I would not say that he did not."

It is claimed that at some time during this period Paul refused to account to his mother. Respecting this matter, Mrs. Kalkwarf testified:

"Q. Did your mother ever ask Paul for an accounting while she was at your place? A. She did. Q. What answer did he give? A. The first time he said he didn't have time, and besides it wasn't necessary, that everything was in black and white, and when the time came he would have everything to show for every amount of money. The second time she asked him that, he said, 'Why, I believe I have a perfect right to ask an accounting of you.', and she said, 'I certainly didn't realize that the Power of Attorney would give you that right, and if so I must see you have a different Power of Attorney,' and Paul said if she insisted on an accounting he would bring all the papers in and she could get someone to look at it. Q. Did Paul ever give her an accounting of the rents, issues and profits of the real estate? A. Not to my knowledge."

Whatever may be the fact about this, Paul did not pay the appellant's bill, and on July 17th, at the instance of the appellant, Mrs. Geschke revoked Paul's power of attorney, gave a note to the appellant for $1,295.40, bearing interest at eight per cent, and secured it by a mortgage on her two wheat farms, and further secured it by giving a chattel mortgage on

". . . all of my one-third interest in the crop of wheat now growing and to be harvested during the crop season of 1933 on the following described real estate: [Here follows a legal description of the two farms.]"

Exactly a week later, and while still living at appellant's home, she sent for a notary and executed a new power of attorney to Paul, giving him the identical powers which she had given him in the instrument revoked a week before. Appellant herself testifies that her mother was at that time perfectly capable of transacting business. Within a few days thereafter, Mrs. Geschke went to live with her daughter, Gretha Mulligan, at Pasco.

Soon after, Mrs. Geschke determined to deed her lands to her favorite son, Paul, who had then farmed them for sixteen years and had actively assisted her in managing her affairs for more than twenty years, upon his agreement to assume and pay the encumbrances, to properly care for her and provide medical services, and all other necessaries during her life, and to provide suitably for her funeral and interment when life should close.

She, being then resident at Pasco, selected from the attorneys in that vicinity an old friend in whom she had great confidence, Mr. C. L. Holcomb, and that her confidence was well deserved is shown by the meticulous care with which he attended to the matter. Not trusting to his own judgment as to her mental capacity, he insisted upon the presence of her physician before

he would permit her to execute the deed. He testified that, after receiving the physician's assurance as to her complete mental capacity, he explained the instrument to her carefully, and out of an abundance of caution caused it to be again explained to her in German, a language which he could not speak with fluency, but which he could understand.

"And I asked Mrs. Geschke why she was making the deed and she said,—'So he will take care of me as long as I live.'"

Mr. Holcomb also testified that he impressed upon Paul Geschke, who was in an adjoining room but took no part in the matter, the heavy obligation he was assuming, for no one could foretell how long a woman in Mrs. Geschke's condition might live. Mr. Holcomb's testimony was fully corroborated in every particular by Gretha Mulligan, Paul Geschke's sister, and Bill Geschke, his brother, who were present when the deed was executed. They, of course, were witnesses testifying against interest, for if the deed were set aside, they would each receive one-eighth of the property involved.

William Arlt, a disinterested witness who had known Mrs. Geschke intimately for more than forty years, testified that in June, 1934, ten months *after* the deed had been made and delivered:

"A. She told me that she signed these papers for her daughter to get her money, and they hadn't told her that they had tied up her crop, and that made her mad and that was why she deeded her land to Paul, because she was satisfied he would take care of her. He had never gone back on her before. I told her I thought that was as good as she could have done, and she felt real tickled about that. Q. You say she said her mind was relieved after she deeded the land to Paul? A. Yes, she said there would be no more quarrels, she could live in peace. Q. Did you ever talk to her again about the deed? A. Not only just that day. Q. Was Mrs. Geschke a woman of very strong mind? A. She was

a pretty smart lady. She always minded her own business. She stated that day that they had brought over a doctor that day and that she hadn't needed anything like that, because she knew what she was doing. Q. Did she state she knew what she had done? A. Yes, sir. Q. Calling your attention to that conversation in Pasco, was anything said by her about her daughter Gretha Mulligan interpreting some of the portions of the deed in German? A. Yes, she said they had her daughter interpret to her in German, and she said, 'I knew what that was.' and that she understood every word of it. Q. Of the English,—and they didn't have to talk the German to her, is that what she said? A. Yes."

There is no evidence in the record to substantiate the allegation respecting undue influence, and all the witnesses who testified, including the appellant herself, certified to Mrs. Geschke's mental capacity. It is strenuously urged, however, that Paul did not account to his mother at the time she made the deed, and that this bare fact should have induced the trial court to cancel the instrument.

The testimony concerning Paul's failure to account has been hereinbefore quoted. It shows that, after telling his mother in a somewhat bantering manner that she, perhaps, ought to account to him, he finally told her that, if she insisted on an accounting, he would bring her all the papers and she could get someone to look at them. The witness (Mrs. Kalkwarf), when asked if he did account, said: "Not to my knowledge." There is other evidence, however, which raises a strong inference that he did not account. Towards the close of the trial, he testified that he did not tell his mother before she made the deed that she did not have any money available for her support. The stating of an account as of that time would have been equivalent to telling her that she did not. Hence, if the testimony, just referred to, is true, he did not account.

The account taken by the trial court in the trial of

the case shows that, at the time the deed was executed on August 16, 1933, Mrs. Geschke still owned her two wheat ranches and the house and lot in Ritzville. She owned, in sacks on the land or in process of severance, the 1933 wheat, which was afterwards sold for $890.66. The court charged Paul with $1,099.06, as of the date the deed was given, which sum included the value of the 1933 wheat. This was equivalent to finding that Paul owed his mother $208.40 in cash at the time the deed was executed, although Paul disputes this and has appealed from that determination. In this discussion, we shall, however, accept it as a fact.

On July 17th, Mrs. Geschke had given the appellant a note for $1,295.40, with interest at eight per cent. This, on August 16th, amounted to $1,304.03. This was secured, not only by a mortgage on Mrs. Geschke's farms, but also by a mortgage on the 1933 wheat. If the wheat and Paul's indebtedness had been applied to appellant's note, it would not have been sufficient to free the land from the mortgage. Besides this, there were overdue taxes on the home farm, amounting to $134.69. A computation of these figures will show that, as to personal assets, Mrs. Geschke was at least $339.66 in the red, or, to put the matter in another way, that the $3,890 which she had in cash on January 3, 1930, had been expended and that she had begun to consume her real property.

It is a fact, then, that, whether Paul Geschke technically accounted or not, when Mrs. Geschke gave him the deed, she was without cash resources and had no income in sight until the next wheat crop, which was a whole year away. She was either compelled to make additional mortgages or resort to some other plan. Although at the time Mrs. Geschke executed the questioned deed she may not have known her financial condition to the exact cent, she must have known substan-

tially what it was. If she did not otherwise know about it, she must have acquired complete knowledge during the controversy between Mrs. Kalkwarf and Paul in the early summer of 1933 concerning the payment of Mrs. Kalkwarf's bill for her care.

She learned then also that at least one daughter, the appellant in this case, would no longer care for her except on a dollar and cent basis, for Mrs. Kalkwarf then exacted from her eight per cent mortgages, not only upon her lands, but upon her 1933 wheat crop. That, of course, made the 1933 crop unavailable for her future support, and she had no other visible personal asset. Nor would any other have been shown or revealed had Paul then rendered a detailed account, for he is even at this date claiming, on cross-appeal, that he did not then owe his mother $208.40, or any other sum. Furthermore, even had he then shown by account rendered that he owed his mother that amount, it is inconceivable that it would have in any way affected her course of action, for that sum would have supplied her needs but for little more than a month, and the next wheat harvest was a whole year away.

There is a great deal of other evidence, not hereinbefore set out in detail, to support the conclusion that Mrs. Geschke deeded the land to her son Paul in an effort to achieve two things, peace and security. It is our opinion, after a careful study of the record, that Paul Geschke sustained the burden of establishing the good faith of the transaction. Even if we were somewhat in doubt as to that, it would still be our duty to sustain the judgment of the trial judge, for he saw and heard the witnesses and was in a much better position to judge of their credibility than we can possibly be.

The respondent, cross-appealing, objects to the disallowance of certain items of his account, and particularly to a reduction made with reference to the cost of

a certain machinery shed. We find no adequate reason to set aside the findings of the trial court as to these matters.

The judgment appealed from is affirmed.

STEINERT, C. J., HOLCOMB, BEALS, GERAGHTY, and SIMPSON, JJ., concur.

BLAKE, J. (dissenting)—I dissent. The court finds that, in obtaining the deed from his mother, Paul perpetrated no fraud upon her. This finding, however, is made in the face of undisputed facts upon which the law, as I understand it, stamps the badge of fraud.

The basic fact, as found by the trial court, is:

"That the defendant, Paul Geschke, failed to account to the said Matilda Geschke for certain of the rents, issues and profits of the property, and that the agreed amount for which the defendant has failed to account, is in the sum of $1,691.06. That the defendant is entitled to credit against said sum as follows: . . .

"Total credits          $  592.00
"Balance due estate $1,099.06"

In other words, at the time the deed was executed, Paul was indebted to his mother in the sum of $1,099.06. This was the equivalent of cash. It was nearly sufficient to discharge Mrs. Geschke's obligation to her daughter. Yet Paul did not, at any time, disclose to his mother this condition of her financial affairs.

Now, the law applicable to these facts is: When a fiduciary relationship exists between two persons, fraud inheres in any transaction in which one, without disclosing all material facts within his knowledge, gains an advantage over the other. In other words, this is one of those instances where the law says that concealment of a material fact constitutes fraud. *Voellmeck v. Harding*, 166 Wash. 93, 6 P. (2d) 373, 84 A. L. R. 608. And this court has been particularly rigorous in applying the rule to transactions between child and parent.

In *Payette v. Ferrier,* 20 Wash. 479, 55 Pac. 629, this court, quoting from *Bogie v. Bogie,* 41 Wis. 219, stated:

" 'The conveyances of property by aged and infirm people to their children in consideration of promised support and maintenance, are somewhat peculiar in their character and incidents, and must sometimes be dealt with by the court *on principles not applicable to ordinary conveyances.*' "

Again, in *Storey v. Gaisford,* 136 Wash. 378, 240 Pac. 9, the court explicitly approved the rule, and held that the burden of proving the utmost good faith was upon the child.

I think Paul not only failed to prove that he exercised the utmost good faith in the transaction, but that he was guilty of the grossest kind of fraud in obtaining the deed from his mother without disclosing to her the fact that he was then indebted to her in an amount practically sufficient to liquidate her obligation to her daughter, Mrs. Kalkwarf. For it is apparent from the facts set out in the majority opinion, that Mrs. Geschke executed the deed in the belief that all her resources, save the land, were exhausted. On these facts, would anyone doubt that Mrs. Geschke could have successfully maintained an action to set aside the deed on the ground of fraud? I think not. Since her right to maintain such an action descends to her heirs and administratrix *(Storey v. Gaisford, supra),* the deed should be set aside.

MAIN and MILLARD, JJ., concur with BLAKE, J.