[No. 29613. Department One. July 5, 1945.]

JAMES HESSELGRAVE, *Appellant,* v. JOHN R. MOTT *et al.,*
*Respondents.*[1]

[1]Reported in 160 P. (2d) 521.

*Frank S. Griffith* and *John T. Dalton,* for appellant.

STEINERT, J.—This was an action for the rescission of a written contract and the cancellation of a deed concurrently executed by the plaintiff and delivered to the defendants. The cause was tried to the court without a jury. The court made findings to the effect that the defendants had failed to perform the terms of the contract in certain respects, and thereupon granted to plaintiff a judgment against the defendants in a specified amount of damages, but refused to rescind the contract or declare the deed null and void, as prayed for in the complaint. Plaintiff, deeming himself aggrieved by the judgment, appealed. Since the defendants have made no appearance in this court, we will continue to designate the litigant parties herein as plaintiff and defendants, or else by name.

For some time prior to September, 1937, plaintiff, James Hesselgrave, owned, and lived alone upon, a tract of land consisting of fourteen and one-half acres near Greenbank, in Island county, Washington. Plaintiff had been married, but whether he thereafter became a widower or merely lived separate and apart from his wife does not appear from the record.

The land upon which plaintiff lived had been logged off many years before and, with the exception of about an acre and a half which he had cleared, was covered with second growth timber. The land was unfenced and lay about a half mile from a county road, access to and from which was had over an old trail or road capable of being traveled

by horse and wagon, but impassable to automobiles. Upon the premises were an old log house, in which the plaintiff resided, and a small log barn of about the same antiquity. The house was in fairly good condition except for the roof, which needed repair; the barn was more or less dilapidated. The highest value placed by any of the witnesses upon the land alone, at any point of time involved in this action, was five dollars an acre, and the highest value placed by any witness upon the entire property as thus improved, considered as of the time of the trial or any time prior thereto, was two hundred dollars. The trial court found that, at the time the contract hereinafter set forth was entered into, the real estate was of the reasonable value of two hundred fifty dollars.

At the time of the inception of the events to which this controversy relates, that is, in the summer of 1937, plaintiff was about seventy-seven years of age, was blind in one eye, and was affected with a general infirmity in health. Although he was able to get about and do light work, his physical condition had reached the point where continual attention and care for him by other persons were necessary. Because of that condition plaintiff had endeavored to get someone who would render him the required care. In the meantime, he had been receiving from the county welfare department a pension, or relief assistance, in the sum of fifteen dollars a month.

The defendants, John R. Mott and his wife, friends or acquaintances of the plaintiff, owned an interest in, and lived upon, a place about a mile distant from plaintiff's home. Mr. Mott had been on plaintiff's land many times and was familiar with the existing conditions.

Sometime in June, 1937, plaintiff called on Mr. Mott and proposed that Mott "take care of him [plaintiff]," in return for which plaintiff offered to give Mott the land above described and also to turn over to Mott all of his monthly "pension" except five dollars. Mott said that he would consider the proposition. After talking the matter over with his wife and with the local storekeeper, the postmaster, and

several other persons, and after he had again visited the premises here involved, Mott agreed to accept plaintiff's offer.

Thereafter, on September 30, 1937, the plaintiff and Mr. Mott in their individual capacities entered into a written agreement, which appears to have been prepared by the prosecuting attorney of Island county, at the suggestion and under the supervision of the county welfare department. The material portions of the contract read as follows:

"That whereas said party of the first part [Hesselgrave] is aged and infirm and requires the constant care and attention necessary to provide for an infirm person, and

"That whereas said party of the second part [Mott] is in a position to provide the necessary care required by said party of the first part, Now THEREFORE, It is mutually agreed by and between the parties hereto, as follows:

"1. Said party of the second part is to provide for said party of the first part, for the remainder of the latter's natural life, an adequate home suitable to the said first party's needs, saving and excepting that said first party will provide for his own board.

"2. In return therefor, and in consideration of said care and keep, said first party hereby agrees to convey to said second party, his heirs and assigns, all right, title and interest said first party has in and to the following described real estate, towit: [Property described], together with all improvements and appurtenances thereunto belonging.

"3. That concurrent with the execution of this agreement said first party herewith conveys, by quit-claim deed, all right, title and interest he may have in and to the above described real estate, to said party of the second part, with the expressed understanding that said second party will not place the same of record until after the death of said first party."

Concurrently with the signing of the contract, plaintiff executed and delivered to Mr. Mott a quitclaim deed in accordance with the agreement. Mott at that time was approximately sixty years of age and appears to have been partially crippled. According to his testimony, Mott contemplated that he himself would eventually become a pensioner.

Pursuant to the terms of the agreement, plaintiff immediately went to live with the defendants at their home and for a little over a year occupied a "shack" which Mott had previously constructed on his own premises. It was apparently understood and agreed between the parties that Mott was to improve plaintiff's property by building thereon a new house for himself and family, constructing a smaller house for plaintiff's separate occupancy, and making other improvements on the land; and that under those surroundings the care and attention provided for in the contract were to be rendered.

With this idea in mind, Mott at once commenced and carried forward the improvement of plaintiff's premises. During the following year he built thereon a two-story house thirty feet by sixteen, with a lean-to twelve by nineteen; a one-room cottage, or cabin, twelve by sixteen; an addition to the barn, sixteen by eighteen; a garage forty feet long; a small cabin, eight by ten; and a chicken house, twenty feet square. He also repaired the well at a cost of fifty dollars; repaired the roof on the old log house; improved the old road or trail by grubbing and leveling it and then placing fifty loads of rock and gravel upon it, thus making it capable of use by automobiles; and cleared about two and a half acres of land. Most of this work was done by Mott's own personal labor, with the aid of a neighbor with whom he exchanged work. The record does not show the actual amount of money which Mott expended for materials used, although it appears to have been in excess of one hundred twenty dollars. It appears, also, that plaintiff himself contributed forty dollars for sawing the lumber that went into the construction work. It further appears that plaintiff voluntarily helped to do some of the construction work at his own convenience, but on account of his physical condition he was unable to do very much. The evidence established, and the trial court found, that the property as improved by Mott was worth about six times its original value, or about fifteen hundred dollars.

About the time the work of improvement neared completion, July 25, 1938, Mott placed of record both the con-

tract and the deed. This, it will be noted, was contrary to the terms of the agreement, at least so far as the deed was concerned. When asked upon cross-examination why he had done this, Mott stated that it was to protect himself against the possibility of a prior deed from the plaintiff to someone else being put of record. He also stated that he had been advised "at the court house" to take that precaution.

In November, 1938, plaintiff and defendants moved from the Mott home to plaintiff's premises. The Motts established themselves in the larger house, and the plaintiff occupied the near-by one-room cottage or cabin. Plaintiff took his meals with the defendants and contributed the sum of ten dollars a month out of his fifteen-dollar monthly pension. This arrangement continued until about the first of May, 1942, a period of approximately four years and eight months following the execution of the contract. Toward the end of that period plaintiff's pension had been increased to twenty-five dollars a month, of which he voluntarily, and apparently in accordance with their original understanding, paid defendants twenty dollars each month. The record is susceptible of no other interpretation than that the relations between the parties during all this time were in every respect harmonious and satisfactory.

It appears, however, that about May 1, 1942, Mr. Mott found it difficult, if not impossible, to earn enough income, while on the premises, to support his family and the plaintiff, despite the fact that the plaintiff was then contributing twenty dollars a month out of his pension. Furthermore, Mr. Mott's own physical condition at that time was such that he could no longer do the work which he previously had been doing in that endeavor. He concluded, therefore, to seek employment somewhere in or near Seattle.

With that in view, but without at first consulting the plaintiff, Mott arranged to have Mr. and Mrs. John W. Earlywine, residents of the community but strangers to the plaintiff, move onto the premises and take care of the old gentleman in the manner provided in the written agreement. When the matter was presented to the plaintiff, he

readily gave his consent to the new arrangement. Mr. Earlywine was at that time employed at Oak Harbor, some distance away, which required his driving to and from work in his automobile.

Under this arrangement, plaintiff continued to pay Early-wine the stipulated portion of his pension, as formerly paid to Mott, and Earlywine in turn paid Mott a monthly amount of seven dollars and a half as rental for the place. It is likewise clear from the record that plaintiff was entirely satisfied with the change, and in fact it appears that he enjoyed life with the Earlywines even more than he had with the defendants.

Leaving the place in May, 1942, Mr. and Mrs. Mott moved to Seattle, where Mr. Mott obtained work as a gardener for about eleven months, during which period he saw the plaintiff only three times. He then obtained employment at the Kirkland shipyards, where he worked for about six months, during which time he saw the plaintiff only twice.

In the meantime, about November 1, 1942, the Earlywines concluded to buy a home of their own in Langley, which also is in Island county. The reason for this intended purchase was that Mr. Earlywine might be nearer to the place of his employment. They discussed the matter with the plaintiff and offered to take him with them. It appears that the Earlywines had grown very fond of the old gentleman and were quite willing to have him continue to reside with them. Plaintiff readily accepted their offer and accompanied them, living with them and turning over to them the proportionate part of his pension as before.

Shortly after moving to Langley, and just about Christmas of 1942, plaintiff became ill and was taken to a hospital in that community. He remained in the hospital about three months and, while he was there, his pension was raised to forty dollars a month. During his illness, the Earlywines visited him regularly.

While plaintiff was in the hospital, his wife's niece, who resided in Seattle, paid him a visit. The niece had not seen the plaintiff in the preceding five years. Shortly after plaintiff had left the hospital, he spent about five days with

the niece in Seattle and then returned to the Earlywine home, where he remained about six weeks, until the late spring of 1943.

During April, 1943, Mrs. Earlywine was troubled with a goiter, and arrangements were made for her to spend a month or six weeks in the hospital. About the same time, plaintiff expressed his desire to "go on a vacation or visit" to his niece in Seattle. With reference to this change of location, plaintiff testified as follows:

"Q. And why did you leave the Earlywines? A. Well, they wanted me—my niece wanted me to come and stay closer to them, see? Q. You left the Earlywines and went to be with your niece? A. Yes. Well, I didn't stay there very long. I got a place over there to the Inn."

At the instance of the plaintiff, Mrs. Earlywine wrote to the niece, requesting that she come and get her uncle. It is clear from the record, however, that the Earlywines considered and expected this to be merely a temporary arrangement. In fact, Mr. Earlywine seems to have been willing to continue keeping the plaintiff, regardless of whether or not the latter contributed anything out of his monthly pension.

In response to the letter, the niece called and took the plaintiff to Seattle. He did not stay at her home, however; at least he did not remain there for more than a very brief time. He took up quarters at an inn for a while and then moved into an old folks' home, where he was still living at the time of the trial in the superior court. While the plaintiff was at the old folks' home, Mr. Mott, who was then working in the shipyard in Kirkland, visited him on the two occasions mentioned above. At no time, however, did Mott offer to take the plaintiff back to the home place in Island county or elsewhere, nor did plaintiff ever make a request to be taken back. Instead, and apparently without any prior notice, suggestion, or indication whatever, plaintiff in June, 1943, shortly after he had gone to Seattle with his niece, instituted this action seeking to rescind the written contract and cancel the quitclaim deed executed in 1937.

After the suit was commenced, defendants, in September of the same year, moved back upon the property in Island county and have been there ever since. Upon the trial, the court asked Mr. Mott the direct question: "You are willing to have the old gentleman back now?" and his answer was: "Why, yes, I will take him back."

The trial court rendered judgment in favor of the plaintiff against the defendants in the sum of two hundred fifty dollars, for the payment of which sum plaintiff was granted a lien against the real estate here involved. The judgment further provided that defendants should have ninety days in which to pay such amount, as damages, and upon payment of that amount by the defendants, the title to the property should vest in them, free and clear of any right that may have existed in the plaintiff.

Upon the appeal, it is plaintiff's contention that the court erred in refusing to rescind the contract *in toto,* and that rescission is the only adequate remedy available to him, under the circumstances shown to exist.

█ In many, and probably in most, jurisdictions, contracts involving conveyances by aged or infirm persons, in consideration of support and maintenance of such person by the other party to the contract or by the grantee named in the conveyance, form a class peculiar to themselves in matters pertaining to their interpretation and enforcement. In those same jurisdictions, it appears to be well settled, for various reasons assigned in the cases, that if such other party to the contract or such grantee in the deed repudiates or substantially fails to perform his agreement, a rescission of the contract and a cancellation of the deed may properly be decreed. 12 C. J. S. 986, Cancellation of Instruments, § 30; Notes (1938), 112 A. L. R. 676.

Early in its history this court aligned itself with the jurisdictions accepting that doctrine. *Payette v. Ferrier,* 20 Wash. 479, 55 Pac. 629; *Gustin v. Crockett,* 51 Wash. 67, 97 Pac. 1091; *Hewett v. Dole,* 69 Wash. 163, 124 Pac. 374; *Gardner v. Frederick,* 96 Wash. 324, 165 Pac. 85; *Storey v. Gaisford,* 136 Wash. 378, 240 Pac. 9.

In the *Payette* case, *supra,* we stated:

"The jurisdiction of a court of equity to cancel a conveyance made by a parent to a child, when the child fails to furnish the support provided by the agreement constituting the consideration for the conveyance, is well established. [Citing and quoting from other cases.] . . . and it is well settled that, where the child attempts to transfer and assign this personal obligation for maintenance which he owes to his parent, the parent has a right to a rescission and cancellation of the conveyance."

This doctrine is by no means limited to situations involving only the relationship of parent and child, but includes, rather, all those in which the relationship between the parties is one of trust and confidence. In the *Gustin* case, *supra,* the principle was stated in broad language as follows:

"This is but the common instance of people who are old and infirm conveying their property to their children, *or to others in whom they have trust and confidence,* where the consideration for the conveyance is, in whole or in part, an agreement for future support and maintenance. In such cases courts of equity have never failed to rescind the contract and cancel the deed for a wilful violation of the agreement to support and maintain, and they never inquire whether the transaction was fraudulent in its inception or not. The wilful and wrongful violation of the agreement is in and of itself ample ground for the rescission. *Payette v. Ferrier,* 20 Wash. 479, 55 Pac. 629, and cases cited." (Italics ours.)

In the *Hewett* case, *supra,* appears this statement:

"In any event, the usually present flagrant abuse of the *fiduciary relation,* and the usual inadequacy of any other relief, impels a court of equity to grant a rescission 'upon principles not applicable to ordinary conveyances.' [Citing the *Payette* case, *supra,* and other cases.]" (Italics ours.)

Again, in the *Gardner* case, *supra,* this court said:

"The rule in this state, as well as the great weight of authority, is to the effect that, where an aged parent conveys property to a son or daughter, *or other person,* in consideration of future support and care, and there is a willful and wrongful withholding of such support and care, in equity the contract may be rescinded, or, if rescission cannot be

had, an action for damages will lie. [Citing the *Payette, Gustin,* and *Hewitt* cases, *supra,* and cases from other jurisdictions.]" (Italics ours.)

For reasons which will appear later, we at this point call attention to the fact that in the *Payette* case, *supra,* rescission was granted upon two grounds, (1) because the grantees in the conveyance subsequently executed a mortgage, construed by this court to have the same effect as a deed, to a third party, and attempted thereby to assign to such third party their obligation for maintenance and support; and (2) because the original grantees in the conveyance subsequently died, thereby rendering them incapable of further performing their contract to support their grantor. For the same reasons, we also make note of the fact that, in the other cases above cited, the court rested the right of rescission by the grantor upon "the wilful and wrongful violation of the agreement," or "the wilful and wrongful withholding of such support," or "the flagrant abuse of the fiduciary relation," by the grantee.

█ It is unquestionably true that the obligation arising out of a contract in which one party agrees to support another is personal to the obligor and cannot be avoided or assigned by him to a third party without the consent of the beneficiary of the obligation. *Payette v. Ferrier, supra; Ford v. Kimble,* 41 Wash. 573, 84 Pac. 414; 4 Am. Jur. 237, Assignments, § 9; 6 C. J. S. 1077, Assignments, § 26.

The case at bar does not fall within the prohibition of this last-mentioned rule because, even if Mott's arrangement with Earlywine be considered to be an assignment, or an attempted assignment, of Mott's obligation owing to the plaintiff, whether temporarily or permanently, the evidence is clear that the plaintiff not only gave his personal assent thereto, but also, without objection, permitted its consummation and accepted the benefits of its provisions; nor is there anything in the record which indicates that Mott was attempting to repudiate or put an end to his obligation, or that the plaintiff was forced to yield his consent because of having no alternative. The situation was one created by physical and economic conditions. For a period of four

years and eight months Mott had scrupulously performed his obligation to provide a suitable home and care for the plaintiff. Unable, in his changed physical condition, to earn enough money, while living on the premises, to support his family *and the plaintiff*, Mott found it necessary to move elsewhere, temporarily at least, and seek remunerative employment of a kind he could perform.

That circumstance did not, of itself, legally relieve Mott of his obligation under the contract, but it did present a situation of practical concern, both to himself and to the plaintiff, calling for some solution under which the purposes of the contract could yet be fulfilled to the mutual benefit of all parties interested therein. That is exactly what was done in this instance, and there is no contention, nor could there validly be any, that the arrangement made with the Earlywines was not a wise or proper one under the circumstances. Furthermore, there is no contention that the Earlywines failed in any respect to provide the plaintiff with a suitable home or render him all the care contemplated in the agreement, or that plaintiff was in any way dissatisfied with the new arrangement.

We are clearly of the opinion that up to the time that plaintiff left the home of the Earlywines and went to Seattle, on or shortly before the first of June, 1943, there had been no breach of the contract by Mott in so far as support and care of the plaintiff was concerned.

It may be conceded, as the trial judge stated in his memorandum decision, that it was Mott's duty, after the arrangement above mentioned had been made with the Earlywines, "to watch out for the old gentleman and to see that he was provided for in accordance with the contract." Mott probably should have kept in closer touch, by personal visitation or at least by correspondence, with the plaintiff and should have been more alert at all times to see that the care and attention given to the plaintiff comported with his own obligation in that respect. But we are not prepared to say, upon this record, that his failure to do so evinced an intention to repudiate the contract by making it impossible of performance by him or that it was "wrongful and wilful"

or a "flagrant abuse of the fiduciary relation," contravening the spirit of the rule announced in the cases above cited.

In our opinion, the most that can be said in criticism of Mr. Mott, with respect to his obligation under his contract to provide a suitable home and the necessary care and support for the plaintiff, is that he failed to "watch out for the old gentleman" after the latter left the Earlywine home and went to Seattle about the first of June, 1943. Had Mott shown a greater concern for the welfare of the plaintiff at that time and then either taken him back to the old home in Island county or else received him in the defendants' Seattle home, there would have been no substantial ground for saying that Mott had not provided a suitable home and care for the plaintiff. It was probably that situation which moved the plaintiff to institute the present action.

We are not overlooking the fact that in 1938, within one year after entering into the contract, Mott placed the deed from the plaintiff on record, contrary to the express provision of the written agreement. That provision, however, did not constitute the essence nor express the fundamental purpose of the agreement, but simply postponed the time when Mott's legal title should appear of public record. The deed had been executed and delivered, and by such delivery the title actually passed, whether or not the instrument was recorded. In any event, there was no prohibition against filing the contract of record. In view of the established facts in this case, and particularly in view of the disposition that we make of it, as hereinafter declared, we deem the mere recording of the deed of no great importance.

We come now to the question which, under the facts shown, presents to us, as it did to the trial court, the only real difficulty in the case. The trial judge stated in his memorandum decision:

"The problem which has given me the most trouble is whether under the peculiar circumstances of this case rescission should be allowed. The evidence shows that defendants did provide for plaintiff for a period of five years, made considerable improvements upon the premises, and the value of said improvements are several times the value

of the real estate. Equity would demand, if rescission were ordered, that plaintiff should reimburse defendants for all of these improvements, or at least a part of them. Plaintiff is an old man, and in all probability would be unable to do that. Defendants in good faith abided by the contract for a long period of time, and it seems to me that the equitable thing to do is to give plaintiff a judgment for Two Hundred Fifty Dollars ($250.00), and a lien against the premises for the payment of that sum within a period of ninety (90) days. Rescission is never ordered where it is unjust or inequitable to do so. The purpose of rescission is to place the parties insofar as possible in the same status as that which existed at the time of execution of the contract. This can not be accomplished in this case."

We agree in large part with the view expressed by the trial court, although we are constrained to modify its judgment in some respects.

█ It is settled beyond dispute that courts of equity or courts exercising equity powers have full jurisdiction to grant relief by ordering rescission, cancellation, or delivery up of deeds, mortgages, contracts, and other written instruments, and that the granting of such relief is controlled by equitable principles. *Reser v. Labude*, 103 Wash. 228, 173 Pac. 1093; *Thiel v. Miller*, 122 Wash. 52, 209 Pac. 1081, 26 A. L. R. 523; *Rozzano v. Moore*, 175 Wash. 566, 27 P. (2d) 1096; 3 Black, Rescission & Cancellation (2d ed.), § 643; 9 Am. Jur. 351, 352, Cancellation of Instruments, §§ 3, 4; 12 C. J. S. 943, Cancellation of Instruments, § 2.

The remedy is not one of absolute right, however, but rests in the sound discretion of the court, to be exercised in accordance with what is reasonable and just under the particular circumstances. In the *Rozzano* case, *supra*, this court said:

"It is not every breach of a contract that entitles the other party thereto to rescind. The breach must be substantial, and, as stated in 6 R. C. L. 926, 'the act failed to be performed must go to the root of the contract.' The text of 13 C. J. 613 is to the same effect. Rescission is to be enforced in equity, and must, under all the circumstances of the particular case, be a just and equitable remedy."

In *Depositors Bond Co. v. Christensen*, 185 Wash. 161, 53 P. (2d) 312, it was declared:

"The remedy of rescission is not one of absolute right, but, like specific performance, its exercise rests largely in the sound discretion of the court."

A clear statement of the law applicable in such cases is contained in 9 Am. Jur. 353, Cancellation of Instruments, § 5, as follows:

"The rule is well established that a person coming into a court of equity for the purpose of obtaining cancellation of an instrument cannot demand cancellation as a matter of right; relief by way of cancellation is a matter within the sound discretion of the court and is granted or withheld by it according to what is reasonable and proper under the circumstances of each particular case. The court should not, and generally will not, grant such relief unless it appears that no injustice will be done by placing the parties in the positions they occupied before the contract or conveyance was made. The court may in its discretion withhold relief even where the ground upon which the plaintiff seeks cancellation is clearly and indisputably established, provided it does not act capriciously and arbitrarily. The court will, in granting relief, impose such terms as it deems the real justice of the case to require."

An equally clear statement will be found in 12 C. J. S. 943, 944, Cancellation of Instruments, § 3.

For reasons apparent from our outline of the facts as previously given and from the view expressed by the trial court, we are of the opinion that plaintiff is not entitled to a rescission of the contract or a cancellation of his deed, and that to grant such relief under the facts here shown would be grossly unjust to the defendants. We believe that the relief which we are about to grant is one that will fully and justly compensate and protect the plaintiff according to his rights under the contract, and, at the same time, will do substantial justice to the defendants thereunder.

We are convinced that the value of the property here involved, including the amount of money advanced by the plaintiff for sawing the lumber, but excluding the value of the improvements made by the defendants, at no time ex-

ceeded the sum of two hundred fifty dollars, which is the amount of the judgment granted by the trial court. We believe, however, that plaintiff should further recover from the defendants a reasonable amount for his care since June 1, 1943, which, concededly, defendants did not render, and we fix that amount also at two hundred fifty dollars. We believe, further, that plaintiff should be permitted to return to the Island county home, if he so desires, and in the future receive the care and attention from the defendants as provided in the contract, defendants having expressed in open court their willingness to conform to that undertaking. Finally, we are of the view that, in the event the plaintiff does elect to so return, some provision should be made whereby the title to the property shall remain in such condition as will protect the rights of both parties under their contract.

Reducing these conclusions to a concrete order, we direct

1. That plaintiff shall have judgment against the defendants in the total sum of five hundred dollars, which shall constitute a lien upon the land here involved, and defendants shall have sixty days after the remittitur herein shall have been filed in this cause, in Island county, within which to pay such sum and discharge such lien; and upon the payment of such amount, the title to the property shall fully vest in the defendants, free and clear of any right that may have existed, or may exist, in the plaintiff.

2. In the alternative, and solely so, if the plaintiff shall elect, in writing filed in the cause, in Island county, within ten days after the remittitur shall have been filed therein, to return to the premises above described, and shall signify in such writing his willingness to proceed under and abide by the terms of the contract referred to above, and if defendants shall likewise in writing signify their willingness so to receive and care for plaintiff then and in that event plaintiff shall have judgment against the defendants in the sum of only two hundred fifty dollars as compensation for incomplete maintenance and care in the past; and further, in such event only, defendants shall be enjoined, during the lifetime of the plaintiff, from conveying or voluntarily en-

cumbering the title to the property, unless the plaintiff shall join in the instrument of such conveyance or encumbrance.

The cause will be remanded to the superior court, with direction to modify its judgment in accordance with the views and order above expressed.

BEALS, C. J., MILLARD, JEFFERS, and GRADY, JJ., concur.

