[Civ. No. 14199.   First Dist., Div. One.   Mar. 7, 1950.]

LOUIS L. SZEKERES, Appellant, v. MAE REED et al., as Administrators, etc., Respondents.

Walker & Walker, Campbell, Hayes & Custer, Frank V. Campbell and Edward J. Niland for Appellant.

Sidney L. Church, Jacob Abramson and Thomas P. O'Donnell for Respondents.

PETERS, P. J.—Plaintiff, claiming to be the grantee of certain real property from the decedent, Oswald Ladd, brought this action against the administrators of Ladd's estate to quiet his title to the property, asserting title under a deed from Ladd dated in 1923 and not recorded until after Ladd's death in 1946. The brother and sisters of Ladd answered and cross-complained, denying the claim of plaintiff and seeking to quiet their title to the property on the theory that there had not been a valid delivery of the deed forming the basis of plaintiff's claim. They also alleged the existence of a confidential relationship between Ladd and plaintiff, and undue influence on the part of plaintiff. The trial court found that Ladd had no intent to divest himself of title to his property, that the deed under which plaintiff claims had not been legally delivered, and that the deed was executed as the result of plaintiff's undue influence. From the judgment based on these findings plaintiff appeals, making two major contentions.

(a) That the trial court erred in admitting, over appellant's objections, evidence of the acts and declarations of the grantor subsequent to and in derogation of the deed; and (b) that, as a matter of law, the evidence is insufficient to support the finding that the deed was executed as the result of undue influence. Neither contention is sound.

Appellant has practiced in San Jose as a drugless practitioner since 1916, and as a chiropractor since 1925. He first met Oswald Ladd in 1916. From that date on, appellant treated Oswald and his mother, and both were frequent visitors at his office. In 1916, Oswald lived with his mother, and farmed the ranch in San Benito County which is the subject of this dispute. It was their sole means of support. There is no doubt that Oswald and appellant, in addition to the professional relationship, became personal friends, and that they frequently went on hunting trips together.

Oswald's mother died in 1920. About three months before

her death she called upon appellant at his home and told him that she did not have long to live and that she wanted Oswald to have the ranch upon her death, he being the only one of her children who had remained on the ranch with her. She commented upon the fact that Oswald had worked on the ranch for years with very little compensation. Appellant agreed to assist her and referred her to his friend, an attorney, Eli Wright, whose office was on the same floor as appellant's. The mother consulted Wright, and he drew a deed naming Oswald as grantee. This deed was entrusted to appellant, with instructions to record it upon the mother's death. Appellant kept the deed, and when informed of Mrs. Ladd's death, recorded it. Appellant testified that shortly after the deed had been delivered to him, he had a conversation with Mrs. Ladd in which she said: "My boy won't have anybody in the world after I die. Everybody is against him. He might need financial aid and I ask you to help him. You are more like a brother to him." Appellant gave his solemn oath to Mrs. Ladd that he would look after and help Oswald.

Shortly after Mrs. Ladd's death appellant made several loans to Oswald. Early in 1921, Oswald borrowed $600 from appellant, and gave him a deed of trust on the ranch as security. Later in that year Oswald got into a dispute with his brother and sisters over certain personal property, including the farm equipment, and he borrowed $1,500 from appellant to purchase this property. Oswald gave appellant a chattel mortgage to secure this loan. Both transactions were supervised by Attorney Wright. Apparently, appellant loaned other sums to Oswald, but his records and memory in reference thereto were confused. These loans have since been repaid in full.

Appellant testified that, between 1920 and September, 1923, Oswald, on several occasions, told him that he wanted him to have the ranch in return for the many favors and kindnesses he had shown Oswald and his mother. Appellant's nurse testified that Oswald had told her the same thing.

The execution and purported delivery of the deed under which appellant claims took place on September 21, 1923. On that day Oswald called upon Attorney Wright. What then took place does not appear. Wright, although alive at the time of trial, was physically and mentally unable to testify. Appellant testified that Wright telephoned to him and asked him to step over to his office; that Whitney, a real estate man and notary, and friend of appellant and Wright, whose office was

on the same floor, was called in as a witness; that Oswald was already there; that the deed was already drawn up; that Wright "read it to Oswald. He handed it over to Oswald to read it himself. He read it and then he signed it. Then he gave it back to Mr. Wright. Then Mr. Wright sealed it and gave it back to Oswald and Oswald gave it to me and he said, 'I want you and your family to have this.' I told him, 'Thank you and I will keep it.' Mr. Wright spoke up and said, 'Now, Doctor, you can go ahead and record the deed.' And I said, 'No.' Oswald said, 'Yes, go and record it,' and I said, 'No, I will not record this during your lifetime' and I told him, 'You own the ranch as you always did. Treat it as your own. Borrow money on it or do whatever you want but pay back whatever you borrow on it and I will assist you as I did in the past.' "

Whitney corroborated appellant as to this occurrence. Admittedly, when this incident occurred, appellant was the financial adviser of Oswald, and, admittedly, no consideration was given for the deed. The deed remained in possession of appellant from 1923 until after Oswald's death in 1946, when appellant caused it to be recorded.

There is substantial evidence that Oswald could read and write at best with great difficulty, and was of limited intelligence. Joe Mota, a neighbor and lifelong friend of the deceased, testified that Oswald often brought letters, bills, and other documents to him to have them read and explained; that he occasionally wrote checks for Oswald which Oswald signed; that Oswald could not write a letter because his spelling was so poor; that he wrote Oswald's Christmas cards and letters; that Oswald, on many occasions, told him that his father had secured a private tutor for him, but that he could not get the lessons "through my head"; that most of Oswald's business was handled for him by a Mr. Gardner of the local hay and grain store.

One of Oswald's sisters testified that the private tutor hired by her father for Oswald was unable to "give any results," and the lessons were discontinued.

Peter Daley, the son-in-law of one of the respondents, testified that he had known Oswald since 1888; that shortly after the death of Oswald's mother, he had a conversation in appellant's office at which appellant and his nurse were present, during which appellant stated, upon being told by Daley that Oswald would receive his mother's ranch, "I am glad to hear

that because, really, Daley, that man hasn't the mind of a 12-year old boy.'' This incident was denied by both appellant and his nurse.

A Dr. Hull testified that he had known Oswald all of his, the doctor's, life; that before he was a doctor he had frequently visited the Ladd farm with his father who was the Ladd physician, and talked with Oswald; that these conversations took place between 1918 and 1920; that he frequently saw and talked with Oswald in and around Hollister; that he had formed an opinion of Oswald's mental condition; that Oswald ''was an individual of not too great intelligence . . . he certainly wasn't a man of even an ordinary degree of intelligence'' that ''he was a dull type of individual, not an alert man, not a man with an alert or active type of mind. He was a pretty dull person to talk to . . .''

A niece of Oswald testified that he never wrote any letters and that, after 1937, she handled almost all of his correspondence.

Appellant produced several witnesses who testified that Oswald was ''as bright as most men,'' or that he was ''of average intelligence.''

Over the objections of appellant the trial court admitted evidence relating to several transactions which occurred after September 21, 1923, all tending to show that after the deed was delivered, Oswald treated the ranch as his own property. Appellant claims that the admission of this evidence was error.

The challenged evidence showed the following:

All taxes on the ranch, before and after 1923, and until his death, were paid by Oswald. After 1923, he tore down old buildings on the ranch, and built new ones, all at his own expense. In 1924, Oswald was sued by San Benito County, and in that action filed a verified answer in which he alleged that he was the owner of the property. Also in 1924, Oswald became indebted in the sum of $3,150 to appellant and gave him a deed of trust on the ranch as security. This deed of trust was notarized by Attorney Wright. The deed is dated in October, 1924, over a year after appellant claims he became the owner in fee of the premises. In an attempt to explain why, in 1924, he accepted a security interest in land he claims to own in fee since 1923, appellant testified that he did it to protect his family if he should predecease Oswald.

As already pointed out, in 1921, Oswald had given appellant a deed of trust to secure a loan, and when the 1924 deed of trust was executed it included the 1921 debt, and the first

deed of trust was reconveyed. The 1924 loan was fully paid off in 1932. In that year Oswald borrowed money from another lender and appellant was repaid, and the new creditor took a deed of trust as security. Sometime later Oswald fell behind in his interest payments to his new creditor, and appellant wrote to Oswald stating: "So in order to avoid any trouble of loosing [sic]your ranch, come in to San Jose as soon as you can, and come to some agreement with him."

In 1934, Oswald, on the advice of appellant, again refinanced his obligations, this time securing a loan for $5,700 from the Federal Land Bank, and paying off his existing creditor, from whom he secured a reconveyance. He gave the Land Bank a deed of trust on the ranch, and this deed was still a lien on the property at the time of Oswald's death. Appellant admitted that he, personally, had borrowed money from the Land Bank, and was therefore familiar with the application forms furnished by that institution, although there is no evidence that he saw Oswald's application. The form filed by Oswald contained his positive assertion that he owned a clear title to the ranch.

There is some evidence that in 1942 or 1943 Oswald complained of the activities of appellant, and told Mota that he was "through" with the doctor, and stated that: "He sure done me dirt."

█ Appellant contends that the evidence, without contradiction, shows a clear and unequivocal delivery of the deed to him, and that, therefore, it was error to admit evidence of the subsequent acts and declarations of the grantor.

· The law on this subject is clear. It was reviewed by this court in *Dinneen v. Younger*, 57 Cal.App.2d 200, 204 [134 P.2d 323], as follows:

"There can be no doubt that upon proof that Rose Dinneen signed and acknowledged the deed and handed the same to the grantee, the plaintiff established a prima facie case of complete execution—that is, of delivery with intent to make the grant operative immediately as a transfer of title. [Citing cases.] The presumption of legal delivery, thus created, is not conclusive. The concept of delivery involves more than merely physically handing possession of the deed to the grantee or someone on his behalf. [Citing cases.] The act of delivery must be accompanied with the intent that the deed shall become presently operative as such, that is,

must be accompanied with the intent to presently pass title, even though the right to possession and enjoyment may not accrue until some future time. (See cases collected 9 Cal.Jur., p. 153, § 52.) The rule applies not only where possession of the deed is given to a third person, but also where such possession is given to the grantee directly. [Citing cases.] Intention to part with title is indispensable—that is the factor that gives vitality to the delivery. [Citing cases.]

"It is also clear that where a valid delivery is established, subsequent acts and declarations of the grantor in disparagement of his deed, outside the presence of the grantee, are not admissible. Such declarations or acts are hearsay and self-serving. (See cases cited *infra.*) But when the very question presented is whether or not the alleged grantor intended a valid delivery—that is, intended to divest himself of title—his declarations and acts made and done outside the presence of the grantee after physically delivering possession of the deed to the grantee or to a third person, are admissible as bearing upon the vital question of intent. This problem has frequently been before the courts of this state. The leading case is *Williams* v. *Kidd,* 170 Cal. 631 [151 P. 1, Ann.Cas. 1916E 703], where an exhaustive review of the authorities is to be found."

The court then quoted with approval from *Williams* v. *Kidd,* 170 Cal. 631, 648 [151 P. 1, Ann.Cas. 1916E 703], as follows:

" 'It is, of course, well settled that acts and declarations of a grantor made after he has parted with the title to property and in disparagement of it are inadmissible when made in the absence of the grantee, and it is the claim of appellants that the conduct and declarations of Williams after the deed was handed to Kidd were inadmissible as contravening this rule.

" 'But here the very question was whether Williams had ever parted with title to the property. This was the main issue in the case, the claim of respondents being that there had been no delivery of the deed with intent on the part of Williams to do so. The conduct and declarations of Williams covered a period subsequent to the making of the deed and while Kidd held it as a depositary, and we are satisfied that such acts, conduct, and declarations of Williams with reference to the property during that period were properly admissible as bearing on the issue as to whether there had been a delivery of the deed. All these matters had some tendency to show that there was no intention on the part of Williams to deliver

it except as a part of a testamentary scheme which he had abandoned.' "

Many cases are cited in support of these fundamental propositions. Mr. Justice Traynor, speaking for the court in *Whitlow* v. *Durst,* 20 Cal.2d 523, 524 [127 P.2d 530], summarized the law on this subject as follows: "When intent is a material element of a disputed fact, declarations of a decedent made after as well as before an alleged act that indicate the intent with which he performed the act are admissible in evidence as an exception to the hearsay rule, and it is immaterial that such declarations are self-serving. Thus, in cases involving the delivery of deeds, declarations of the alleged grantor made before and after the making of the deed are admissible upon the issue of delivery, and it is immaterial that such declarations are in the interest of the party producing them. [Citing cases.]" (See annotations 105 A.L.R. 398; Ann.Cas. 1916E 713; 19 Cal.L.Rev. 231; 26 Cal.L.Rev. 631.)

The facts of the present case clearly bring it within the rule of the above cases. There is no doubt, of course, that the deed was handed to appellant in Attorney Wright's office by Oswald, but the very question at issue is the intent with which that manual delivery was made. The trial court had the right to consider the fact that in 1923, when Oswald, without limitation, is supposed to have divested himself of the title to the ranch, he was 49 years of age, not in ill health, and solely dependent upon the ranch for his support. It is not reasonable to suppose that any reasonable man, under such circumstances, would give away his sole means of support. The court also undoubtedly considered the evidence that Oswald was of limited intelligence and could hardly read and write. It is of significance that neither appellant nor the notary testified that anyone at the meeting in Wright's office explained to Oswald the effect of a legal delivery. Of even greater importance is the fact that appellant admittedly promised Oswald's mother to act as Oswald's financial adviser, and admittedly acted in that capacity. There was ample evidence that Oswald looked to appellant for financial aid and advice. There can be no doubt but that such evidence supports the finding that a confidential relationship in fact existed between the parties. This is not seriously disputed by appellant. While this factor is also relevant to the issue of undue influence, it is also relevant on the issue under discussion. In such a case the burden is on the grantee to rebut the presumption of fraud

and undue influence. This elementary rule was stated in *Sparks* v. *Mendoza,* 83 Cal.App.2d 511, 514 [189 P.2d 43], as follows: "If a confidential relationship exists between a grantor and grantee and there is no consideration, a presumption of fraud and undue influence arises, shifting the burden of proof to the grantee to show fairness and good faith in the transaction, and upon his failure to do so the presumption of fraud and undue influence prevails and will support a finding that there was not a delivery of a deed." In that case the court found that a confidential relationship existed between the grantor and grantee because "the evidence discloses that (a) decedent was not familiar with the English language, (b) plaintiff acted as her mother's agent and adviser in various business transactions, (c) the mother had received no independent advice before executing the deed in question, and (d) there was no consideration for the deed."

In the present case we have one who was in a confidential relationship to Oswald claiming to have received from Oswald, without consideration, a deed to the property constituting the grantor's sole means of support. The evidence clearly indicates that there was sufficient doubt as to Oswald's intent to warrant the trial court in admitting into evidence the acts and declarations of the grantor made after the date of the claimed delivery. These acts and declarations show that after 1923 Oswald acted as if he owned, and declared that he was the owner of, the property.

The finding that Oswald signed the deed as the result of the undue influence of appellant is also supported. Appellant claims to the contrary, and also urges, quite properly, that there was no evidence to warrant a finding that Oswald was incompetent. The trouble with this last argument is that no finding of incompetency was made. The court simply found, by adopting the allegation in the pleadings, that Oswald "all during his lifetime was a person of limited education and understanding." That finding is amply supported.

As already pointed out, the finding that a confidential relationship existed between the grantor and grantee is supported, and as also pointed out above, in such cases a presumption of undue influence arises. (In addition to *Sparks* v. *Mendoza, supra,* see *Johnson* v. *Clark,* 7 Cal.2d 529 [61 P.2d 767], and *McNulty* v. *Copp,* 91 Cal.App.2d 484 [205 P.2d 438].) The proper rule in such cases was stated as follows in the frequently cited case of *Bacon* v. *Soule,* 19 Cal.App. 428, 434 [126 P.

384] : "A 'confidential relation' in law may be defined to be any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent. A 'fiduciary relation' in law is ordinarily synonymous with a 'confidential relation.' It is also founded upon the trust or confidence reposed by one person in the integrity and fidelity of another, and likewise precludes the idea of profit or advantage resulting from the dealings of the parties and the person in whom the confidence is reposed. [Citing cases.]

". . . the party in whom the confidence is reposed must stand in his dealings with the other party unimpeached of the slightest abuse of the confidence reposed, and if he derives or claims any advantage from the relation, the law places upon him the burden of showing that the transaction out of which the advantage arose was fair and just and fully understood and consented to by the party confiding in him."

■ Appellant contends that, because the evidence shows that Oswald voluntarily handed him the deed, the presumption of undue influence was rebutted. But that is not all that is required. The grantee in a confidential relationship to the grantor must also show that the gift was made "with a full knowledge of all the facts, and with a complete understanding of the effect of the transfer." (*Brown* v. *Canadian Indus. Alcohol Co.*, 209 Cal. 596, 598 [289 P. 613], citing many cases.) The evidence and the reasonable inferences therefrom on this issue were conflicting and this court, therefore, cannot interfere with the finding.

■ Appellant also claims that Oswald received independent advice from Attorney Wright, and from his friends Mota and Gardner. Although the evidence shows that these men may have advised Oswald on other matters, there is not one word of evidence that he received any advice from anyone concerning this particular transaction. Although the failure to receive independent legal advice is not conclusive of undue influence, in a transaction such as this one, it is a circumstance which may be considered by the trial court. (*Brown* v.

*Canadian Indus. Alcohol Co., supra; Helbing* v. *Helbing,* 89 Cal.App.2d 224 [200 P.2d 560].)

Under the facts it was for the trial court to determine whether the presumption of undue influence was rebutted. Its finding that it was not is supported by substantial evidence and therefore cannot be successfully challenged.

The judgment appealed from is affirmed.

Bray, J., and Schottky, J. pro tem., concurred.