272 P.2d 298

**McNABB  v.  BREWSTER et al.**

No. 8030.

Supreme Court of Idaho.

June 18, 1954.

Jones, Pomeroy & Jones, Pocatello, for McNabb.

McDevitt & McDevitt, Pocatello, for Cates and Hale.

Black, Black & Oliver, Pocatello, for Manda Brewster.

TAYLOR, Justice.

The land involved is a 160 acre farm which had been community property of John W. and Queen Wilson. Burl McNabb, tenant on the farm, filed an interpleader action to have the court determine to whom he should pay the rent. John W. Wilson died March 10, 1949, survived by his widow, Queen Wilson and two daughters, Manda Brewster and Inez Cates. Manda Brewster claims the land and rent by virtue of a deed from John and Queen Wilson. Inez Cates, Queen Wilson and the administrator of the estate of John Wilson, by cross complaint seek cancellation of the deed on the ground it was obtained by fraud and undue influence, and that the grantors were incompetent. The widow died before the trial and the administrator of her estate was made a party. Ike Brewster, a son of Manda Brewster, was the original administrator of the estate of John W. Wilson. Before trial Roy Hale was appointed in his stead and joined in the cross complaint of Inez Cates.

At the time of the execution and delivery of the deed here involved, the grantor, John W. Wilson, was 85 years of age and Queen Wilson was 89. Prior to that time they had been living in their own home at Buckskin. Mr. Wilson had been suffering for some time from an incurable cancer of the stomach. Mrs. Wilson had been sickly for a long time, at times confined to bed, periodically suffering hallucinations and at times needing personal care and assistance. Neither could read or write. Both were infirm, forgetful, childish and senile. Due to this situation, cross-complainant, Inez Cates, and her husband took up residence

with the decedents during the winter of 1947–48. They left in May, 1948. The reason is not apparent, unless it be that the old people were hard to please. One neighbor said that Mr. Wilson would get "mad" and run one daughter off and then do the same with the other. In the meantime, Mrs. Wilson's condition had become worse and Mr. Wilson was fearful that she might set fire to the house or harm herself because of her hallucinations. Following a suggestion by Mr. Burl McNabb, a neighbor and tenant, Mr. Wilson went with Mr. McNabb to Pocatello and asked the cross-defendant, Manda Brewster, to come to the home and care for him and his wife. Mrs. Brewster moved to the home in June, 1948, and began caring for the old people. On August 3, 1948, she brought them to the real estate office of Mrs. Grace Bistline, a notary public, of Pocatello, where they requested Mrs. Bistline to prepare the deed in question. The deed was prepared and executed by the grantors, in the presence of Mrs. Brewster, who at that time signed two instruments drawn by Mrs. Bistline, cross-complainant's exhibits 2 and 3A, by the terms of which she undertook and agreed to stay with them and care for them the rest of their lives. Exhibit 2, a carbon copy, is as follows:

"In consideration of real and personal property left me by my mother and father, Queen Wilson and John W. Wilson, and which is to become my personal property at and upon the death of both my parents, and not until both have passed away, I hereby consent and agree to stay with them and care for them the rest of their life in a good, kind and satisfactory manner.

"Should I fail in my obligation to both of my parents or be unable to care for them then their gift of real and personal property to me shall be null and void and they are free to distribute as they see fit.

\*     \*     \*     \*     \*     \*

"Received from Grace Bistline the original paper of which the above is a copy this 22nd day of March, 1949.

"/s/   Manda Brewster"

Exhibit 3A recites that "in consideration of our daughter, Manda O. Brewster, staying with us and caring for us the rest of our days in a satisfactory way and as we have been used to living, we hereby direct that after the death of both of us all our household furniture and bedding and clothing and other personal effects be given to her as her own personal property."

These exhibits evidence the fact that the deed was intended to have testamentary effect. As such it was ineffectual. Unless its character was changed by the subsequent delivery, it could not operate as a gift inter vivos. Zimmerman v. Fawkes, 70 Idaho 389, 219 P.2d 951.

The deed and exhibits 2 and 3A were left with Mrs. Bistline with instructions that she was not to deliver the deed to Mrs. Brewster until the grantors authorized her to do so.

Mrs. Bistline testified that Mrs. Brewster executed the original of Exhibit 2 at the time the deed was executed and that she kept it in her possession until March 22, 1949, when she delivered it to Mrs Brewster and took her receipt therefor. Mrs. Brewster at first denied receiving the original, although she acknowledged her signature on the receipt for it, and then said she didn't remember such a paper, and did not have it. When the exhibit was offered in evidence, the objection that it was not acknowledged, not authorized or signed by the Wilsons, and that it was an attempt to vary the terms of the deed, was sustained. This ruling was clearly error. The consideration recited in the deed is "love and affection and other valuable consideration." When the consideration for a deed is material to the issues, evidence thereof is admissible. 26 C.J.S., Deeds, § 199; 16 Am. Jur., Deeds, §§ 433, 436, 437. In such a case, evidence of an oral agreement as to the consideration may be shown. In De Atley v. Streit, 81 Mont. 382, 263 P. 967, the Montana court said:

"* * * appellants have argued in their brief that the introduction of oral proof of the agreement of the defendants to support and maintain the plaintiffs was not permissible under the Statute of Frauds * * *. The purpose of introducing the testimony to which reference is made was not to change or vary the terms of the deeds, but only to show what was the actual consideration for them." 263 P. at page 971.

See, also, annotation in 112 A.L.R. at 695.

Two of the neighbors, Murl McNabb and Arlene McNabb, testified that Mrs. Brewster told them in July when she came to Buckskin, that she was going to get the land for taking care of her folks, that she wasn't going to do it for nothing. Thus, she expressed her plan. So the evidence is quite conclusive that the deed was not given for love and affection alone. The question of consideration became important to the determination of the ultimate question of fairness and good faith, and the presence or absence of fraud or undue influence, on the part of the grantee.

The allegations of the answer and cross complaint, as amended, put in issue the failure of consideration. The evidence is sufficient to justify cancellation of the deed on the ground of Mrs. Brewster's neglect and refusal to care for the decedents. Caramini v. Tegulias, 121 Conn. 548, 186 A. 482, 112 A.L.R. 666, and exhaustive note 670 at 676 et seq.; 26 C.J.S., Deeds, §§ 148 and 153; Gustin v. Crockett, 51 Wash. 67, 97 P. 1091; Hesselgrave v. Mott, 23 Wash.2d 270, 160 P.2d 521. Admittedly the property conveyed was worth $10,600 and constituted practically the entire estate of the grantors. The conveyance left them paupers without means of support, and disinherited their other daughter, Inez Cates. When Queen Wilson became so ill that the doctor rec-

ommended hospitalization, Manda Brewster refused on the ground that Queen had no money, and Manda could not afford it. The doctor arranged for her to be admitted as a county patient, and the county paid her bill.

On August 2, 1950, Mrs. Brewster's son, Grant Brewster, made an affidavit before the probate judge of Bannock County, averring, under oath, that he made the affidavit for the purpose of obtaining indigent aid from Bannock County for Queen Wilson; that Queen Wilson had no income and no property; that Inez Cates, a daughter, was employed; and answered "yes" to the question contained in the form as to whether or not any property had been transferred during the last two years, and in the space provided for particulars, inserted "Sold to Steve Miller." It appears from the record that thirty acres of land was sold to Steve Miller in 1947, and that a balance due of $719.23 still owing by Miller to Wilsons on that transaction was all of the estate left to the Wilsons after the conveyance to Manda Brewster. It is significant that Grant Brewster concealed from the probate judge of Bannock County the fact that property of the value of $10,600 had been conveyed by Mrs. Wilson and her husband to Grant's mother within two years of the making of the affidavit. Grant Brewster is the son who took his mother in his car to the office of Mrs. Bistline on January 13, 1949, to get the deed, and from there, "I took her right straight to the court house." He also testified that he did not stop any-

where and make any alteration on any instrument his mother had in the envelope she obtained at Mrs. Bistline's office. He had already testified that he accompanied his mother to the bedside of his grandfather in the hospital on January 13th, before driving her to Mrs. Bistline's and then to the court house, and that he was present in the room when his mother talked to his grandfather. It was on this occasion that Mrs. Brewster testified her father asked her if she had had the deed recorded. Although neither she nor her son Grant were permitted to relate the conversation, they both sought to convey the idea that they went to Mrs. Bistline's for the deed at Mr. Wilson's direction. It would be absurd to suggest that at the time he made the affidavit before the probate judge, Grant Brewster did not know of the transfer of his grandparents' entire estate to his mother. Moreover, this affidavit was no doubt made with the knowledge and acquiescence of Manda Brewster. It was a necessary step in the proceedings by Dr. McMahon and herself to have her mother admitted to the hospital as a county patient.

When Inez Cates learned of her mother's confinement in the hospital, she went to visit her and thereafter, having obtained the permission of the county commissioners, she took her mother to her home and there supported her and cared for her until she died (August 26, 1952) without any help, financial or otherwise, from Mrs. Brewster. It is, therefore, clear that Mrs. Brewster

wilfully and without excuse refused to perform her agreement to support the grantor, a part of the consideration and one of the conditions upon which the deed was executed. It also appears, from the fact that she went to the office of Mrs. Bistline and took away the original agreement to support, in which the consideration for the real property was specifically mentioned, over two months after she had procured and recorded the deed, and her failure to produce the document at the trial, that she was fraudulently seeking to conceal the true consideration for the deed. This fraudulent conduct is further supported by the false affidavit made by her son. Aside from it being itself sufficient ground for the cancellation of the deed, this conduct on the part of the grantee is, without more, sufficient proof of fraud and undue influence in procuring the execution and delivery of the deed, to warrant a court of equity in holding it void. Johnson v. Clark, 7 Cal.2d 529, 61 P.2d 767. It is proof that the promise of support was not made in good faith, but was a fraudulent device used to procure the execution and delivery of the deed. In Leathers v. Leathers, 77 Cal.App.2d 134, 174 P.2d 875, the court set aside a bill of sale of farm machinery given by a mother to her son, holding that the son's fraudulent representation that the bill of sale was mere security to protect him against loss on a lease in case she died, constituted undue influence, and overcame the mother's will. There are numerous authorities holding that the procuring of a conveyance, under the circumstances detailed here, is a constructive fraud. Nobles v. Hutton, 7 Cal.App. 14, 93 P. 289; Johnson v. Clark, 7 Cal.2d 529, 61 P.2d 767; Pailhe v. Pailhe, 113 Cal. App.2d 53, 247 P.2d 838; Wells Fargo Bank & Union Trust Co. v. Brady, 116 Cal.App. 2d 381, 254 P.2d 71; Annotation 112 A.L.R. 687; 26 C.J.S., Deeds, § 21 b, pages 196–197; § 57 c (2), page 281; § 58; 16 Am. Jur., Deeds, § 32.

True, Mrs. Bistline obtained the approval of both grantors before delivering the deed. But, this approval was obtained when the grantors were in a worse condition as to health and enfeeblement than they were at the time the deed was executed. Mr. Wilson was on his death bed and ensuing death was inevitable, as Mrs. Brewster knew. Mrs. Wilson was living with Mrs. Brewster in the latter's apartment in an apartment house in Pocatello. Her health and enfeeblement had been and were progressively worsening. One witness, a neighbor in the apartment house, testified that, after the death of Mr. Wilson and before Mrs. Wilson went to the hospital, Mrs. Brewster frequently cursed Mrs. Wilson and called her vile names in and about the apartment house and within the presence and hearing of other people. This is denied by Mrs. Brewster, but, if true, would constitute a breach of her agreement for kind care, such as has been held sufficient to justify cancellation of the conveyance. Annotation 112 A.L.R. 708. It also em-

phasizes the fact of Mrs. Brewster's complete domination over Mrs. Wilson.

▮ The rule to the effect that the burden of proving undue influence rests upon the party making the charge, and that a confidential relationship between grantor and grantee does not raise a presumption of undue influence, is applied by the courts only in cases where the facts and circumstances do not raise an inference of fraud or overreaching. In cases where the facts do raise an inference of fraud or overreaching, the courts are almost unanimous in holding that the presumption of undue influence arises, and that the burden is then cast upon the grantee or donee to prove by clear and convincing evidence that the transaction was fair and just and free from fraud or undue influence. Burns v. Skogstad, 69 Idaho 227, 206 P.2d 765; Smith v. Smith, 84 Kan. 242, 114 P. 245, 35 L.R.A., N.S., 944; Storey v. Gaisford, 136 Wash. 378, 240 P. 9; 38 C.J.S., Gifts, § 65 f, page 861, § 67, page 877.

Turner v. Gumbert, 19 Idaho 339, 114 P. 33, and Dickey v. Clarke, 65 Idaho 247, 142 P.2d 597, are predicated upon the authority of Goodwin v. Goodwin, 59 Cal. 560, a California decision of 1881. The rule there announced has long since been repudiated by the courts of California. The rule currently adhered to in that state was set out in Sparks v. Mendoza, 83 Cal.App.2d 511, 189 P.2d 43, as follows:

"1. Where the relationship between the parties is that of parent and child and the parent relies on the child for advice in business matters, a gift *inter vivos* from the parent to the child which is without consideration and where the parent does not have independent advice is presumed to be fraudulent and to have been made under undue influence.

\* \* \* \* \* \*

"2. If a confidential relationship exists between a grantor and grantee and there is no consideration, a presumption of fraud and undue influence arises shifting the burden of proof to the grantee to show fairness and good faith in the transaction, and upon his failure to do so the presumption of fraud and undue influence prevails and will support a finding that there was not a delivery of a deed." 189 P.2d 43, at page 45.

In Campbell v. Genshlea, 180 Cal. 213, 180 P. 336, at page 341, the Supreme Court of California said:

"It is to be remembered that in a case involving a purported gift inter vivos, based upon an alleged consideration of love and affection, where the donee is a daughter having the control and direction of the aged donor, a strong presumption of confidential relation arises which would place upon the beneficiary in the transaction the burden of showing fairness in dealing and full understanding on the part of the person parting with the property.

Nobles v. Hutton, 7 Cal.App. 14, 93 P. 289. In the absence of such showing, the conveyance is presumed to have been obtained by undue influence and to be void."

Other California cases announced the same principles. Nobles v. Hutton, 7 Cal.App. 14, 93 P. 289; Payne v. Payne, 12 Cal. App. 251, 107 P. 148; Cox v. Schnerr, 172 Cal. 371, 156 P. 509; Wilbur v. Wilbur, 197 Cal. 1, 239 P. 332; Laherty v. Connell, 64 Cal.App.2d 355, 148 P.2d 895; Azevedo v. Leavitt, 76 Cal.App.2d 321, 172 P.2d 704; Pfingst v. Geotting, 96 Cal.App.2d 293, 215 P.2d 93; Solon v. Lichtenstein, 39 Cal.2d 75, 244 P.2d 907.

In Re Estate of Randall, 60 Idaho 419, 93 P.2d 1, Mr. Justice Holden (author of the opinion in Dickey v. Clarke, supra) quoted from Schouler on Wills, 1926 Supp. § 305, as follows:

"'The general rule is that the mere existence of a confidential relation between the testator and a beneficiary in his will does not establish undue influence unless it appears that the beneficiary was active in the preparation and execution of the will.'" 60 Idaho 419, at page 430, 93 P.2d 1, at page 5.

In Re Estate of Randall, 64 Idaho 629, 132 P.2d 763, 135 P.2d 299, the court, speaking through Mr. Justice Givens, said:

"Harmonizing these various rules, it would seem that where the gift is to executrices who are shown to be fidu-

ciaries the burden of proof is upon such donees to clearly and unequivocally prove a gift in the first instance, and to so prove it that there would be no uncertainty as to the intent (and other requisite concomitants) on the part of the donor nor any question of undue influence exerted by the donee upon or over the donor or advantage taken of the confidential relationship existing between the parties." 64 Idaho 629, at page 640, 132 P.2d at page 768.

The same rule was announced in Blake v. Blake, 69 Idaho 214, 205 P.2d 495. The rule announced in the second In re Estate of Randall case, and in Blake v. Blake, was quoted and followed in Claunch v. Whyte, 73 Idaho 243, 249 P.2d 915. In In re Lunders' Estate, 74 Idaho 448, 263 P.2d 1002, Chief Justice Porter, emphasizing the importance of activity on the part of the beneficiary in the preparation of a will, cites and follows the California doctrine. A similar principle, applicable here, is declared in Harrington v. High, 39 Idaho 555, 228 P. 883, and Oatman v. Hampton, 43 Idaho 675, 256 P. 529.

In the first In re Estate of Randall case in 60 Idaho, Justice Holden quoted approvingly from Colorado as follows:

"'It follows from the very nature of the thing that evidence to show undue influence must be largely, in effect, circumstantial. It is an intangible thing, which only in the rarest instances is

susceptible of what may be termed direct or positive proof. The difficulty is also enhanced by the fact, universally recognized, that he who seeks to use undue influence does so in privacy.'" 60 Idaho 419, at page 429, 93 P.2d 1, at page 5.

On the same theme, In re Hannam's Estate, 106 Cal.App.2d 782, 236 P.2d 208, was quoted In re Lunders' Estate, supra, as follows:

" 'Direct evidence as to undue influence is rarely obtainable and hence a court or jury must determine the issue of undue influence by inferences drawn from all the facts and circumstances. Taken singly the facts or circumstances may be of little weight, but taken collectively they acquire their proper weight and may then be sufficient to raise a presumption of undue influence.' " 74 Idaho 448, at page 454, 263 P.2d 1002, at page 1006.

"The health, age, and mental condition of the donor may afford evidence of the exercise of undue influence, and may be sufficient to establish it when considered in the light of other circumstances. If, at the time of the gift, the donor's mind was enfeebled by age and disease, even though not to the extent of producing mental unsoundness, and the donor acted without independent and disinterested advice, and gift was of a large portion or all of the donor's estate, and operated substantially to deprive those having a natural claim to the donor's bounty of all benefit from the donor's estate, these circumstances, if proved and unexplained, will authorize a finding that the gift is void, through undue influence, without proof of specific acts and conduct of the donee." 38 C.J.S., Gifts, § 67, page 887.

In some jurisdictions a gift is invalid which leaves the donor a pauper and without means of support. 38 C.J.S., Gifts, § 33.

Some courts hold to the effect that in addition to the relation of parent and child, age, infirmity and the dominant position of the donee, a fiduciary relationship, or a relationship of trust and confidence, must be shown to exist, in order to give rise to the presumption of undue influence and to cast the burden of proof upon the donee. Here it appears from the facts recited that the grantors did repose trust and confidence in the grantee, and that a confidential and fiduciary relationship did exist between the parties. Stearns v. Williams, 72 Idaho 276, 240 P.2d 833. However, the matter is placed beyond controversy by the admission contained in Mrs. Brewster's answer to her sister's cross complaint, to-wit:

"Answering paragraph 7, defendant and cross-defendant admits that Manda Brewster and Ike E. Brewster had transacted business matters for the said John W. Wilson and Queen Wilson pertaining to the real property herein-

before mentioned, and to the real property owned by them to the end that said John W. Wilson and Queen Wilson consulted with the said Manda Brewster and Ike E. Brewster in such matters and had complete trust and confidence in them, * * *."

There can be no question that this is a case for application of the rule that the burden was upon the donee to establish that the transaction was fair and just and free from any taint of fraud or undue influence. This she wholly failed to do. Practically all of her affirmative evidence is directed to the question of the competency of her parents, and a denial by her that she exercised any influence over them.

We have referred to the consideration in the deed as, in part, love and affection, and, in part, the agreement to care for and support, and have applied the rules governing gifts. This is proper because, although the agreement to support be regarded as a valuable consideration, under the circumstances the conveyance was basically a gift. It would be characterized as a gift upon a condition subsequent, or with a conditional limitation. 19 Am.Jur., Estates, § 68, p. 532; 50 Am.Jur., Support of Persons, § 22; 38 C.J.S., Gifts, § 36

As to the appellant's contention that grantors were incompetent, under the rule that the finding of the trial court is binding if supported by substantial and competent evidence, the record would sustain the trial court's finding that Mr. Wilson was competent to make and deliver the deed. As to Mrs. Wilson, the reverse is true. The following excerpts from the testimony of witnesses who had known her for many years, her daughter Inez, and her neighbors, who had been in frequent contact and association with her during the last years of her life, and particularly during the time pertinent to this inquiry, require a finding that she was not competent, either to execute the deed or consent to its delivery.

(Inez Cates) "Q. Do you know what was her ability to understand business arrangements, or business?

A. She couldn't * * * She couldn't understand.

*      *      *      *      *      *

"Q. Will you try to describe for us the general condition of your mother, Mrs. Wilson for instance, during the winter of 1947 and 1948, physically and mentally, just describe her? A. Well, she was very poor. She could see all kinds of things, Mexicans in the lamps in the lantern and coming up from or through the floor and she was really bad. And my Dad wanted me to see if I could get her mind changed onto something else and he asked me and I told her there wasn't any such thing as that and she said oh, yes there was, and I could never convince her that there wasn't and during that time she was seeing things coming up through the floor."

324

(Burl McNabb) "A. She was poorly, up and down. She would have good days and bad days. * * * Well, she wasn't too well and she told me, or Mrs. Wilson told me up at her home at different times at night that she was sick and seeing different things and of that nature, Mexicans and the like and so on.

"Q. By that you mean hallucinations, or did she actually see Mexicans? A. She said she really saw them.

"Q. Were there any Mexicans around there? A. No. * * * Well, she was in a weakened condition and very nervous and generally very poorly versed. * * *

"Q. Could she understand general business arrangements and terms and things of that nature? A. Not too well."

. (Dr. McMahon) "A. Well, she presented the typical picture of an aged individual, and they always have this mental picture where they have lucid intervals, that is normal and understand what you say and then they will have forgetful intervals. I talked to her at her home four or five house calls that I made to the house. One day she would recognize me and tell me all about her medicine and the next time she wouldn't. She showed the typical picture of an elderly person, not stable. * * * An aged person is more emotional and if you happen to catch them in one of those emotional stages you can usually influence them and you can't reason with them as easily."

(Mrs. A. McNabb) "Q. Every time you went there she would see Mexicans, she would say she could see Mexicans? A. She would talk about them an awful lot * * * toward evening she would talk about these Mexicans. * * *

"Q. And what would say about them? A. She would say they came down off the mountains and down into the basement and up through the mopboards and through the floors and they slept in the bed with the old man and they sat on shelves and then after while she would talk a little bit, and then she would fall back onto these Mexicans again and it was over and over and over, the same thing. * * * Well, she was an old person and she never was too bright. * * * Yes, I thought she was quite childish."

(M. McNabb) "And what would you state her mental condition was during that time? A. Well, she was, well, Mrs. Wilson as it has been told before never was very bright I would say very childish and no education whatsoever; couldn't tell the time of day, count money or anything but oh, I would say the last three or four or five years was the worst except that Mecican time talking about.

"* * * What facts did you observe that led you to believe that her mental condition was failing? A. Well, to start with Mr. Wilson in fact asked us to come out getting afraid the old lady was going to set the house afire. She had a torch after these Mexicans so of course we would go out and that is when Mrs. Brewster came out and took care of her. She was afraid she would do something, set the house afire, do something to herself. * * * Well, that went on some time before Mrs. Brewster come; that is why she come. She was getting dangerous, Mrs. Wilson, and I know one time bringing her to town and he was in the back seat and she was in the front and she asked me if I would take her to the Sheriff and have him go up there and run those Mexicans out, and Mr. Wilson jogged me and said pay no attention to her that she is crazy. So of course—I joshed along with the old lady you know and finally she got off that strain and onto something else, and at the house she would talk about them during the evening.

"Q. What would she say about them? A. Well, they would just swarm in there and one night Mr. Wilson come out and got us and she had a stick was beating his bed and she said they were in there with him and just pouring in the house, in the base-ment, up out of the basement, out of the mopboards and come in like spiders. * * * She got so she wouldn't know me until I spoke and then she would."

Following Manda Brewster's denial that her mother was seeing Mexicans, in rebuttal, the following:

(M. McNabb) "Q. During the summer of 1948 in the presence of Manda Brewster did you observe Queen Wilson carrying on about the Mexicans? A. Yes, sir. * * * She said the old lady was crazier than a God damn bed bug.

"Q. Who said that? A. Manda Brewster. * * * She said she seen them all the time, especially evenings. * * * That is her mother seen them. * * * Well, to start with Mr. Wilson talked to me a lot about this. This has been going on for years. He hasn't wanted to put her in an institution and—* * *

"Q. * * * what was your observation during the summer of 1948 as to whether Mrs. Wilson was childish? * * * A. Very much so."

(Mrs. A. McNabb) "A. Well, she [Mrs. Brewster] just told us her mother was crazier than a God damn bed bug.

"Q. Did she give any reasons? A. The way she was talking about these

Mexicans and things. She was worried about them, too, about her mother. * * * She would just tell how silly her mother was and about these Mexicans and she was afraid she was going to burn the house up. * * *

"Q. Would she [Mrs. Wilson] carry on a conversation with you? A. Well, it would all be silly. * * *

"Q. * * * was she as you recall a normal mental person? A. Well, no."

The property conveyed, being the community estate of the grantors, and Mrs. Wilson being incompetent, the result is the same as though Mr. Wilson had executed, acknowledged, and delivered the deed without her joining therein. Thus, under the statute, the deed was and is void and of no effect. § 32–912, I.C.

Upon the trial of this cause there were various erroneous rulings excluding evidence offered by the appellants on the objection that it would violate the parol evidence rule. Witnesses, who were not parties were not permitted to testify to statements or conversations with the decedents, apparently on the theory that such witnesses were not competent to testify under § 9–202, I.C., or that the testimony sought was hearsay. Such testimony was admissible and should have been admitted. Fritcher v. Kelley, 34 Idaho 471, 201 P. 1037; Crenshaw v. Crenshaw, 68 Idaho 470, 199 P.2d 264; Fredricksen v. Luthy, 72 Idaho 164, 238 P.2d 430; Dinneen v. Younger, 57 Cal.App.2d 200, 134 P.2d 323; Szekeres v. Reed, 96 Cal.App.2d 348, 215 P.2d 522; 31 C.J.S., Evidence, § 239.

However, there was no evidence offered by the respondent which was rejected, except certain conversations had by her with the decedents, which would be incompetent, since she is a party. All of the evidence material and admissible offered by her was admitted. In view of this situation, no reason appears why the cause should be retried.

The judgment should be reversed and the cause remanded with directions to enter judgment cancelling the deed and restoring the property to the estate of the grantors.

PORTER, C. J., concurs.

GIVENS, Justice.

█ I concur with the portion of the opinion by TAYLOR, J., reviewing and analyzing authorities culminating in the holding that the burden of proof herein was upon the donee to establish the transaction was fair and just and free from any taint of fraud or undue influence.

█ It is apparent the trial court did not apply this rule of law in making his findings and conclusions and this error is, therefore, so serious and so prejudicial that, considered in connection with other erroneous

rulings excluding admissible evidence raised by assignments VIII and IX, requires a new trial be had.

The judgment and decree are, therefore, reversed and the cause remanded for a new trial. Costs to appellant.

This disposition renders unnecessary and, therefore, inopportune, a review of the evidence, which should be left for the trier of facts upon a new trial.

THOMAS, J., concurs in ordering a new trial.

KEETON, Justice.

In a determination of the matters here submitted, four Justices are of the opinion that the judgment should be reversed. Two are of the opinion that a new trial should be granted and two that judgment should be entered for appellant. I am of the opinion that the judgment should be affirmed. The facts found by the trial court, supported by competent, substantial evidence, are sufficient to sustain the judgent, and in fact, preponderate in favor of respondent. I find no reversible errors. However, if the judgment is to be reversed, I concur in the conclusion that a new trial should be granted.

I disagree with the analysis of the evidence and conclusions reached by Justice TAYLOR and concurred in by Chief Justice PORTER.