359 P.2d 1010

Thornton D. WYMAN, Executor of the estate of Hattie M. Straus, deceased, Plaintiff-Appellant,

v.

Lue S. DUNNE, Defendant-Respondent.

No. 8856.

Supreme Court of Idaho.

Feb. 23, 1961.

Z. Reed Millar, Boise, for appellant.

Anderson, Kaufman & Anderson, Samuel Kaufman, Boise, for respondent.

TAYLOR, Chief Justice.

August 6, 1958, plaintiff (appellant) commenced this action, as guardian of the estate of Hattie M. Straus, to recover from defendant (respondent) certain corporate stocks alleged to be the property of the ward. August 8, 1958, the ward died. Thereafter plaintiff was appointed executor and as such was substituted as plaintiff.

At the time of her death, the deceased was a widow, 83 years of age, and had been a widow approximately ten years. She had no children. The plaintiff and his sister, nephew and niece of deceased, are her sole heirs and chief beneficiaries under her will.

About 1951 the defendant, a neighbor who had been driving decedent's car and rendering other service for her, upon decedent's invitation, moved into her home and thereafter lived at the home together with decedent and a housekeeper. The court found that:

"defendant assisted not only in ordinary household chores but administered

to the personal needs of Hattie Straus herself. That as time progressed Mrs. Straus became physically enfeebled and plagued with Parkinson's disease, anemia, diabetes, a stroke which left her partially paralyzed and general complications attending old age and during all of this time defendant faithfully and selflessly carried out her wishes and cheerfully and devotedly administered to her every need and request. In 1953 Mrs. Straus named defendant in her will as the legatee of a modest sum of money and several years later executed to him a deed to her home, retaining unto herself a life estate. The relationship between defendant and Mrs. Straus was very close and she regarded him warmly, fondly and affectionately. He did not advise her in business affairs but dutifully carried out her own requests and desires with regard thereto."

The defendant's service to decedent was continuous from 1950 until the date of her death, and consisted of driving her automobile, taking her places where she desired to go, such as to her farms, the bank, hairdresser's, and to the grocery store, so long as she was able to go out in the car. He assisted the housekeeper, brought the groceries to the house, and was the only person in the house to look after decedent's needs during the night. To enable her to awaken him when she needed help in the night, he arranged a can on the dining-room table with a string attached leading to the bed in her bedroom. By means of the string she was able to pull the can from the table and waken defendant with the resulting noise. During certain periods in 1958 when a nurse was employed in the home, defendant assisted the nurse in the personal care of decedent, turning her and lifting her in and out of bed and to the toilet, and took her out for rides in a wheelchair. These services were performed willingly and with kindness, and the deceased preferred the care and attention of the defendant to that of the housekeeper or nurse.

In her will, executed in 1953, deceased made a bequest to the defendant of $1000, her Buick automobile and an upright piano. By codicil, executed in June, 1954, she devised her home to defendant. In November, 1956, pursuant to request of the defendant, the deceased executed and delivered to defendant a deed conveying to him the home, subject to a reserved life estate. Negotiations leading to the execution of this deed resulted in two written agreements executed simultaneously therewith. The first (Exh. 3) was between the plaintiff and his sister, and defendant. This agreement recites the substance of the will and codicil, and the desire of decedent to convey the home to defendant, subject to a life estate in her. It then recites:

"Whereas, It is the desire of the respective parties to settle all present,

past and future claims of every nature of Lue S. Dunne in respect to any claims under the Will and Codicils and in respect to her property and of all property rights if there is a lawful marriage between Lue S. Dunne and Hattie M. Straus or in event of a marriage between them, and of all property rights and claims, including marital rights and property rights if any there are now, or shall be hereafter. * * *

"And in consideration of said transfer of the home by deed, subject to the life estate, at this time to the said *Lou* S. Dunne, he hereby agrees to accept the deed in full and complete settlement of all claims of every character and nature against the property and estate of Hattie M. Straus, and as a full and complete determination of marital rights and property rights of said Lue S. Dunne, past, present and future, and agrees to make no claim against the property and estate of said Hattie M. Straus."

The second (Exh. 4) is an agreement between the deceased, Hattie M. Straus, and defendant, and, among other things, recites:

"Whereas, It is the mutual desire of the respective parties hereto to settle past, present and future claims of every nature, including all property rights by Will, Codicil or otherwise and marital rights of every nature. * * *

"And whereas, It is now the desire of the first party to make a gift deed to the second party, upon certain considerations hereinafter set forth, subject to· a life estate reserved in the first party.

"Now therefore, In consideration of the mutual consideration herein set forth and the sum of One ($1.00) Dollar and other good and valuable consideration paid by each party to the other,

"The first party agrees to deed to the second party, the following described property, to-wit: The home at 1205 Franklin Street, Boise, Ada County, Idaho described as follows:

"Lot 11 of Block 72 of the Original Townsite of Boise City, Ada County, Idaho.

"subject to the life estate reserved to the first party, * * *

"And in consideration of said transfer of the house by deed at this time subject to a life estate, the second party agrees to provide a home for her during her .lifetime and relinquishes any and all past, present or future claims, of every kind and character, or, by reason of marriage or future marriage of the parties, to first party's property or estate now or hereafter; or by reason of first party's intestacy or testamentary disposition by her other than as

provided in said above will and codicils, it being the intent of the parties to settle all property rights by this agreement and said above will and codicils, which will and codicils the second party accepts as such. * * *

"In further consideration the first party hereby waives any claim to the property of the second party by reason of marriage or otherwise."

The evidence supports the further finding of the court that:

"On July 8, 1958, at her own suggestion and following her own desire, Hattie Straus gave to defendant eight stock certificates representing shares of stock of Standard Oil Company of New Jersey, Union Pacific Railroad Company and The Idaho First National Bank, all having an aggregate market value of approximately $15,000.00. Being unable to write because of the Parkinson's disease she endorsed the certificate by her mark in the presence of Dr. George Baker who had been her attending physician for approximately two years and Mr. and Mrs. Charles Guthman who had been next door neighbors and closely acquainted with her for over forty years and the defendant. At this time and also at her death approximately one month later, Hattie M. Straus owned estate, in addition to these stock certifi-

cates, in excess of $52,000.00 over and above any obligations owing, which net estate consisted primarily of two ranches of the approximate value of $40,000.-00 and liquid assets of the approximate value of $12,000.00.

"The evidence in this case is clear and convincing that while at the time of the gift of the stock certificates to defendant on July 8, 1958, the decedent was suffering severe physical afflictions, was weak, substantially paralyzed and her ability to speak was considerably limited, she was nevertheless rational, knew she was making a gift of stock certificates to defendant, fully intended to make such a gift, knew that the stock certificates she was giving to defendant were valuable, knew generally the nature and extent of her estate, appreciated the nature and effect of the act she was then undertaking ie: transferring by gift valuable stock certificates to defendant, and was entirely free from any coercion, deception, fraud or undue influence on the part of any person whatsoever and was completely exercising her own free will and intent with reference to the gift of these stock certificates to the defendant which gift was completed upon her endorsement of the certificates and delivery thereof to and acceptance by the defendant and was

·intended to and did take effect immediately."

The court concluded that the transfer of the stocks by decedent to defendant was a valid gift, and entered its judgment that he was the owner and entitled to the possession thereof.

On this appeal plaintiff urges (a) that at the time the stocks were transferred the decedent was incompetent, and that she acted under the undue influence of defendant, who occupied a confidential, fiduciary relationship to her, and (b) that defendant in procuring and accepting the gift violated the agreements he had entered into with plaintiff and his sister, and with decedent.

Mrs. Straus had been suffering various illnesses through the years following her husband's death. She had been afflicted with pernicious anemia, paralysis agitans, and diabetes for some years prior to May, 1958. In the latter part of May, 1958, she suffered a stroke and was admitted to the hospital June 2nd in a coma. She remained in coma or in a stuperous state for three or four days, after which she improved to the extent that she was released from the hospital and returned to her home on June 13th. At home she remained bedridden except for an occasional ride in a wheelchair. Urinary incontinence and infection and bedsores plagued her during that period. She was unable to feed herself or write because of her tremors. On July 15th she had a "sinking spell," and was returned to the hospital where she died August 8th.

The testimony as to her mental competency on July 8th, when the transaction in question occurred, is conflicting. The plaintiff, who saw her on the 8th, testified, "She was incompetent to handle any business affairs."

Dr. Paul Minor, who saw her at the hospital in June, and at her home on July 5th and 6th, gave his opinion that at the times he saw her she was not "competent to conduct any of her business affairs," and that "it would be extremely unlikely that she would have been mentally competent to have conducted any business affairs, or would have had proper judgment on the 8th."

Dr. S. M. Poindexter examined Mrs. Straus on July 15, 1958, for about a half hour. He testified, "She was the typical picture of physical paralysis agitans," and gave his opinion that "she was not then competent to transact her business affairs," and that her competency on the 8th of July "was no different than it was on the 15th of July." On cross-examination it was developed that the doctor, in part at least, based his opinion of the patient's mental competency upon her physical competency. He said:

"in my opinion she was completely physically unable to carry on her own

affairs and with that I felt in order to competently carry on her affairs mentally she had to have some ability physically which she did not have.

"Q. One can be completely paralyzed and mentally competent? A. Yes they can.

"Q. To know the nature and extent of their property and natural objects of their bounty; is that not true? A. That is right, they can be.

"Q. What inquiry did you make of her to determine that? A. I made no specific inquiries as I recall."

Dr. George R. Baker, who had been her attending physician from June, 1956, to the date of her death, and who saw her frequently both before and after the transaction, and who was present on the 8th, and who witnessed her signature, made by an "X" on the certificates transferred, and who assisted or "guided her hand" in the making of her mark, testified that she appeared to be better than she had been on the morning of the 8th, "so far as her alertness goes;" that in response to his questions she answered that the instruments being transferred were stock certificates and that they were valuable; that she knew what she was doing and "appeared to be willing and eager to sign those certificates;" and that he detected nothing to indicate that she was actuated by coercion or influence.

Dr. Glenn E. Talboy, who saw her at the hospital from July 19th until her death, testified that during that period, in his opinion, she was incompetent "actually as far as transacting business" although during that time "there were times when she was probably rational" and that "she was probably incompetent on the 8th day of July."

Lola Marenholtz, a special nurse who attended the deceased from June 13th to July 6th, and from July 15th to the day of her death, testified that she was more alert in the morning and "most of the times in the morning when I had come to work, you know, she would be alert enough to say 'good morning' to me," and gave her opinion that Mrs. Straus was not able to understand or conduct business affairs during the time she attended her. This witness also testified that deceased at times saw dogs and people through the window, and materials on the wall, that were not there.

Mrs. Powell, who was housekeeper for Mrs. Straus from January 3, 1956, to July 15, 1958, except for two periods of absence—one of a few days in 1956 and the other of approximately two months in 1957—testified in detail of defendant's kindness and attentiveness to deceased; that he had fed her her meals during the last year of her life, and that she had never observed or overheard the defendant at any time trying to influence Mrs. Straus in

any way other than with respect to her physical comfort and well-being.

The defendant testified that the deceased, without any request or suggestion on his part, directed him to bring out her stock certificates on the morning of July 8th, telling him she was going to sign them over to him; that he complied and asked Dr. Baker and the neighbors, Mr. and Mrs. Guthman, to come in as witnesses; that she was alert and rational when the stocks were transferred.

Mr. and Mrs. Guthman testified that at the time of the transaction the deceased spoke to them and called them by name when they came in to act as witnesses; she was alert and rational; that she knew what she was doing and executed the instruments willingly.

Lutie L. Tulloch, a nurse of forty years' experience, including five years in the Ada county hospital, during which time she had considerable experience with elderly and mentally incompetent patients, testified that she cared for Mrs. Straus from July 6th to July 13th; that on July 8th "she was very alert," "she was very rational," "she was rational all day;" that in the morning she had been out for a ride in the wheelchair; that Dr. Baker came at noon and that the witness withdrew while the business transaction was taking place; that at that time plaintiff came to the house and there was a scene or disturbance; that Mrs. Straus was upset because there had been an argument; and that the witness put her to bed and told her she was sorry this had happened, and that she must be very quiet; in response Mrs. Straus remarked, "I am sorry I didn't do this long ago," or "I am sorry, I should have done this a long time ago." The witness gave it as her opinion that Mrs. Straus knew what she was doing and was capable of directing her own affairs.

The essential elements of a gift inter vivos are set out in Zimmerman v. Fawkes, 70 Idaho 389, 219 P.2d 951. The first two of those elements are drawn in question here. The first is, a donor competent to contract, and the second, a donor acting with freedom of will. Although different conclusions might be drawn from the conflicting evidence as to the mental capacity of the decedent on July 8th, there is substantial, competent evidence to support the finding of the trial court that Mrs. Straus was competent to and did understand the nature and effect of the transfer she was making, that she fully intended to make the gift, and that she acted of her own free will. Schwarz v. Taeger, 44 Idaho 625, 258 P. 1082; In re Heazle's Estate, 74 Idaho 72, 257 P.2d 556; In re Lawrence's Estate, 286 Pa. 58, 132 A. 786; In re Ash's Estate, 351 Pa. 317, 41 A.2d 620.

The evidence is conclusive that during the period of defendant's residence in the home of Mrs. Straus, he, by his attentive-

ness and kindness, ingratiated himself into her confidence and good will. His relationship to her became that of a fiduciary. There is no evidence of fraud, and there is no direct evidence of undue influence. The strongest evidence tending in that direction is the state of facts surrounding the relationship of the parties to the gift. Such facts may be summarized as follows:

■ The defendant, a stranger by blood, moved into the home of the deceased and there lived for a period of six or seven years; he spent his entire time waiting upon and attending to the comfort and well-being of the deceased, an elderly woman; during that time he received from her a deed of gift to the home and, by will, her automobile, piano, and $1000; and thereafter shortly before her death he received from her the gift of stocks valued at $15,000. Assuming such evidence sufficient to raise an inference or presumption of overreaching or undue influence, the result would be to cast the burden upon defendant to prove by clear and convincing evidence that the transaction was fair and just, and that the deceased acted without any coercion or undue influence. McNabb v. Brewster, 75 Idaho 313, 272 P.2d 298; Estate of Randall, 64 Idaho 629, 132 P.2d 763, 135 P.2d 299; Claunch v. Whyte, 73 Idaho 243, 249 P.2d 915; Idaho First Nat. Bank v. First Nat. Bank of Caldwell, 81 Idaho 285, 340 P.2d 1094; 38 C.J.S. Gifts § 65f.

■ On the other side of the issue of undue influence are the facts; that the defendant did not intrude himself into the home or life of the decedent, but was invited therein by her; that his attentions to her were constant, felicitous and kindly, and without any disagreement between them, except as to proposals made by him and intended for the promotion of her physical comfort; the testimony of the housekeeper, nurses and neighbors that she was a person of strong will, not easily influenced, and one who "had a mind of her own;" and the fact that the gift did not deplete her estate, but left property exceeding $50,000 in value to pass by her will to her nephew and niece, showing that she was not influenced to the extent of forgetting or disinheriting these natural objects of her bounty.

The trial court imposed the burden of proof upon the defendant, and we conclude that the finding of the trial court to the effect that the defendant sustained the burden of proof resting upon him as a fiduciary is supported by the evidence.

■ We consider now plaintiff's contention that, by reason of the written agreements which he executed with the deceased and her heirs, defendant did not have legal capacity to accept the gift in question, or that his acceptance thereof constituted a breach of those agreements. We note that in both the contracts he

agrees not to assert any further claim, and relinquishes his right to make any further claim, against the estate or property of the deceased, and that the settlement therein and thereby made is a complete settlement of all past, present and future claims or demands. There is no evidence that defendant breached his agreement, or that the gift was the result of any demand or claim asserted by him against the deceased or her estate. The gift being the free and voluntary act of the decedent, its acceptance by defendant did not constitute a violation of his agreement.

The agreement with the deceased was made with her alone, and was entirely separate and independent from that concluded by defendant with plaintiff and his sister. Therefore, insofar as the evidence might tend to sustain a contention that the defendant violated the intent of his agreement with the deceased, his act would not, for that reason alone, constitute a violation of his agreement with the plaintiff and his sister. The consideration for the promise made by defendant to Mrs. Straus flowed from her. The plaintiff and his sister were not signatories to that agreement and there was, therefore, no consideration by way of mutual promises or otherwise inuring therefrom to the plaintiff and his sister. At that time they were only expectant heirs without vested right or interest. The deceased remained free, up to the time of her death or so long as she remained competent, to change her will or, by other means, to dispose of her estate contrary to the provisions of the existing will and codicils. 26A C.J.S. Descent and Distribution §§ 61, 63. She had made no binding agreement that plaintiff and his sister would inherit the property in question.

Plaintiff also assigns as error the rulings of the trial court excluding evidence tending to impeach the testimony of Dr. Baker to the effect that deceased on July 8th in making the gift knew what she was doing and had sufficient mental capacity to know and understand the nature of making the gift to defendant. This testimony by the doctor was given on his first cross-examination. No attempt to impeach was made during the redirect examination. On re-cross-examination the only reference to her mental capacity was the doctor's statement that she was alert on July 8th. This same statement had been made on his first cross-examination.

■ The attempted impeachment occurred on the re-redirect examination. It consisted of showing to the witness written notes of statements purported to have been made by him to the plaintiff, Wyman, on July 8th after the making of the gift in question. The writing purports to contain a statement by the witness to the effect that the deceased was "not fully competent to fully grasp her business and affairs," and "not competent to handle business af-

fairs." Objection was made that the evidence offered was not proper re-redirect examination, and was an attempt to impeach the plaintiff's own witness without showing that the witness was hostile. There is no requirement that the party producing a witness must show that the witness is hostile before he may impeach the witness by showing that he has made statements inconsistent with his present testimony. I.C. § R9–1207. The objection on that ground was not valid and should have been overruled. The same objection was made to a further offer of the same proof; but the objection that it was an attempt to impeach plaintiff's own witness without showing the witness to be hostile, was subsequently withdrawn.

■ Defendant also urged as a further ground of objection that the impeaching statement related only to competency to handle business, and not to competency to make a gift. The mental capacity required to make a valid gift, such as here involved, is no greater than that required to make a will.

" 'A person who has mental power to understand and to transact the ordinary business affairs of life, doubtless, has capacity to make a valid will. But the converse is not necessarily true. Mental perception and power to think and reason of a lesser degree than that which is required in the understanding and transaction of ordinary business may be all that is requisite to the full understanding of everything involved in the execution of a will.' In re Sexton's Estate, 199 Cal. 759, 251 Pac. 778." Schwarz v. Taeger, 44 Idaho 625, 258 P. 1082, 1084.

However, recognizing the distinction as to degree of capacity contended for, the objection goes rather to the weight to be given the impeaching statement than to its admissibility, and should have been overruled.

■■ The validity of the ruling, therefore, ultimately rests upon the objection that the offered proof was not proper on re-redirect examination. The ruling on that ground was technically correct. Wurm v. Pulice, 82 Idaho 359, 353 P.2d 1071. Competent evidence should not be excluded on such grounds alone. However, considering the qualified nature of the impeaching statement, and its limited relevancy noted above, and the consequent improbability of its having any effect on the result of the trial, we do not consider the error assigned sufficient to warrant a reversal.

Judgment affirmed.

Costs to respondent.

SMITH, KNUDSON, McQUADE and McFADDEN, JJ., concur.